# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *People ex rel. City of Chicago v. Le Mirage, Inc.*, 2013 IL 113482

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS *ex rel.* CITY OF CHICAGO, Appellant, v. LE MIRAGE, INC. (Calvin Hollins, Jr., *et al.*, Appellees). |
| Docket No. | 113482 |
| Filed | April 4, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Where, after a fire and fatal stampede, operators of a second-floor nightclub were adjudicated in indirect criminal contempt for willful violation of court orders, the appellate court should not have found the orders ambiguous and the charges unproved and reversed where the evidence did not show that the orders were unclear and a rational jury could have found the operators fully aware that the orders forbade occupancy of both the second floor and the mezzanine above it and willfully violated them. |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Daniel Gillespie, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on          Stephen R. Patton, Corporation Counsel, of Chicago  (Benna Ruth
Appeal              Solomon, Myriam Zreczny Kasper and Kerrie Maloney Laytin, of
                    counsel), for appellant.

                    Abishi C. Cunningham, Jr., Public Defender, of Chicago (Lester Finkle
                    and Vicki Rogers, Assistant Public Defenders, of counsel), for appellee
                    Calvin Hollins, Jr.

                    Christopher W. Carmichael, Chelsea C. Ashbrook and Darren H.
                    Goodson, of Holland & Knight LLP, and Victor P. Henderson, of
                    Henderson Adam LLC, all of Chicago, for appellee Dwain Kyles.


Justices            JUSTICE KARMEIER delivered the judgment of the court, with opinion.
                    Chief Justice Kilbride and Justices Freeman, Thomas, Garman, Burke,
                    and Theis concurred in the judgment and opinion.

**OPINION**

¶ 1                                 I. INTRODUCTION

¶ 2        Respondents, Calvin Hollins, Jr., and Dwain J. Kyles, through a corporation, Le Mirage, Inc., owned and operated a restaurant and nightclub in a two-story building located at 2347 South Michigan Avenue in the City of Chicago. In 2002, the City filed a building code enforcement action in the circuit court of Cook County, alleging that dangerous and hazardous conditions existed on the premises in violation of the building code. On July 19, 2002, the court entered an order, which it revisited and reentered on three subsequent occasions, prohibiting occupancy of the second floor. Respondents nevertheless continued to operate the nightclub on the second floor until February 17, 2003, when there was a fight on the dance floor, and security guards released pepper spray to break up the fight. Panic ensued, and patrons rushed to exit the nightclub, crowding into a narrow staircase to reach the first-floor exit. Tragically, 21 people were crushed to death, and 50 others were injured.

¶ 3        The City then filed a petition for adjudication of indirect criminal contempt against respondents for willfully violating the court's orders. After a jury trial, respondents were convicted of indirect criminal contempt and sentenced to two years in prison.

¶ 4        Respondents appealed, arguing that the trial court erred in instructing or not instructing the jury on certain matters, making certain evidentiary rulings, and considering certain evidence at sentencing. Instead of addressing the issues raised by respondents, the appellate court reversed their indirect criminal contempt adjudications and vacated their sentences, finding that they were not proved guilty beyond a reasonable doubt of willfully violating the

building court's orders because the orders were ambiguous and did not provide in reasonable detail the acts prohibited. 2011 IL App (1st) 093547.

¶ 5     This court allowed the City's petition for leave to appeal. For the following reasons, we reverse the appellate court's judgment and remand to the appellate court for consideration of the issues respondents raised but the appellate court did not address.

¶ 6                                    II. BACKGROUND

¶ 7     In the 1980s, Lesly Motors, Inc., began leasing the subject premises to respondents. The lease provided that respondents would be responsible for all structural and nonstructural repairs and maintenance of the building. Respondents operated various restaurants and nightclubs in the building up to, and including, the date of the tragedy. During the relevant time period, they operated a restaurant known as Epitome on the first floor of the building. On the second floor, they operated a nightclub known as Epitome 2 or E2, which consisted of a main dance floor, two bar areas, and a mezzanine along three walls, which extended approximately 15 feet over the second floor. Initially, the mezzanine, which was suspended above the second floor by trusses connected to the ceiling, was not closed in with glass or drywall. However, respondents later remodeled the mezzanine, using the trusses to create separation for several VIP rooms and skyboxes.

¶ 8     On April 29, 2002, a City building inspector inspected the premises and found that the VIP rooms on the mezzanine were constructed improperly and without a permit. On June 18, 2002, the City filed a building code enforcement action against Lesly Motors, alleging that dangerous and hazardous conditions existed on the premises in violation of the building code and seeking an injunction requiring Lesly Motors to correct 11 violations.

¶ 9     On July 19, 2002, the parties entered their first appearance in building court. Assistant corporation counsel Demetrius Kare appeared for the City, and Edward J. Morris appeared for Lesly Motors. Le Mirage was voluntarily impleaded into the action. Its attorney, Thomas Royce, could not appear so his office mate, Bradley Prendergast, appeared in his stead and waived service of summons on Le Mirage's behalf.

¶ 10    During a brief discussion before the hearing, Kare and Prendergast preliminarily agreed that the VIP rooms and mezzanine would be closed. At the outset of the hearing, Kare stated:

     "Judge, City has cited several violations pertaining to the second floor V.I.P. rooms attached to this nightclub. *** [Le Mirage] agrees not to occupy the second floor V.I.P. rooms."

Prendergast stated: "That's correct, Judge." The judge made handwritten notes on the court file (half sheet) stating: "BA [by agreement] Mirage [*sic*] will not occupy 2nd floor VIP rooms."

¶ 11    The judge asked the City if there were other issues to be addressed. In response, Kare asked to call Marguerite Shahi, a City building inspector, who inspected the building on July 16, 2002. Kare asked Shahi: "Other than the items that we already addressed, is there anything else that's dangerous and hazardous that you would like to address to the Court?" She responded:

-3-

"One is the substandard partitions that were used to build the V.I.P. rooms that are supported by the [bow truss] roof. *** [T]here should be absolutely no weight on structural members especially suspended from a [bow truss] roof ceiling. So, the whole second floor would be dangerous and hazardous ***."

Kare then asked her: "And an Order today to not occupy that second floor would abate your concerns?" She responded: "Yes." Kare then asked her: "Are there any other violations besides the second floor that you are concerned about?" She responded: "No. The second floor is the major one."

¶ 12    At the close of the hearing, the court stated: "Your agreement is no occupancy of the second floor. You have to keep it vacant."

¶ 13    The court's written order dated July 19, 2002, referenced "2347 S. Michigan Ave." and stated: "Mandatory order not to occupy 2nd floor." The matter was continued to August 9, 2002, for case management "and hearing on 2nd floor occupancy."

¶ 14    Prendergast left the hearing before getting a copy of the written order, returned to his office, and drafted a letter to Royce, stating:

> "I appeared in court today. The city inspector testified that the sky-boxes on the second floor over looking the dance floor are dangerous and hazardous because they are suspended from the [truss]-roof. *** [T]he matter was set for hearing on *** the lack of use of the second floor on August 9th. *** The judge entered an Order that the second floor mezzanine not be used, the VIP room, until there is a hearing."

¶ 15    At the August 9, 2002, hearing, Kare appeared for the City and Royce appeared for Le Mirage and Lesly Motors. The following colloquy ensued:

> "MR. KARE: The matter was set for hearing as to the conditions on the second floor[.] *** There was an order to unoccupy. We're asking the order be continued to September 6th, as well as an order of interior inspection.
>
> THE COURT: Any dangerous/haz[a]rdous conditions?
>
> MR. KARE: I may call the inspector if the Court wishes to hear any[t]hing further.
>
> THE COURT: Other than the second floor, which has been addressed by the agreement not to occupy?
>
> MR. KARE: Right, and the mezzanine *** the V.I.P. rooms ***.
>
> MR. ROYCE: We've agreed to that your Honor.
>
>                                        * * *
>
> THE COURT: Matter for conference September 6th, and in particular the dangerous, haz[a]rdous condition relates to the structure of the second floor?
>
> MR. KARE: Pertains to the V.I.P. rooms and mezzanine.
>
> THE COURT: It's the structure?
>
> MR. KARE: We don't know if there's no plans or permits on file. We don't know if they can support the weight, these people occupying the second floor.
>
> THE COURT: This is the floor that's supported by the roof trusses?

-4-

MR. KARE: That's correct.

MR. ROYCE: No one has been in the premises since, other than employees and workers. They won't go up there."

¶ 16    The court's written order dated August 9, 2002, states: "Mandatory order not to occupy 2nd floor of subject premises," again "2347 S. Michigan." The matter was continued to September 6, 2002.

¶ 17    At the next hearing on September 6, 2002, Kare appeared for the City, and Morris appeared for Lesly Motors. Counsel for Le Mirage failed to appear. Kare advised the court: "As you're aware, *** July 19th, the City moved that the second floor and the mezzanine not be occupied. That was granted." He also informed the court that the inspector had not been "able to gain entry to the second floor" for an inspection and asked to file a petition for a rule to show cause, which was allowed.

¶ 18    The court's written order dated September 6, 2002, again referenced "2347 S. Michigan" and stated: "All previous orders remain in full force and effect." The matter was continued to October 25, 2002.

¶ 19    At the next hearing on October 25, 2002, Kare appeared for the City; Morris appeared for Lesly Motors; and Kyles, who was a licensed attorney, appeared for Le Mirage, identifying himself as "the owner." The parties had reached an agreement for a building inspection, and the City withdrew its petition for a rule to show cause. The following colloquy ensued:

"JUDGE: Are there any dangerous and hazardous conditions?"

Mr. Kare: They would be abated, if the Court does continue the previous orders not to occupy the mezzanine, the second floor, and the VIP rooms—

JUDGE: Is that agreeable, Mr. Kyles?

Mr. Kyles: Yes."

¶ 20    The court's written order dated October 25, 2002, again referenced "2347 S. Michigan" and stated: "All prior orders to remain in full force and effect." The matter was continued to March 7, 2003.

¶ 21    Despite entry of the above-described orders, respondents continued operating E2 on the second floor. The tragedy occurred during the early morning hours of February 17, 2003.

¶ 22    The following day, February 18, 2003, the City filed a petition for adjudication of indirect criminal contempt against Le Mirage and Kyles for willfully violating the court's orders. The petition was subsequently amended to add Hollins and omit Le Mirage.

¶ 23    Kyles and Hollins were also charged with 63 counts of involuntary manslaughter related to the 21 deaths. They were ultimately acquitted of those charges.

¶ 24    The first jury trial on the contempt charges ended in a mistrial based on the prosecutor's improper comment on what the defense would be during opening statements. Respondents moved to dismiss the proceeding on the ground that double jeopardy barred retrial, arguing that the City intended to provoke a mistrial. The trial court denied the motions.

¶ 25    Respondents filed timely interlocutory appeals, which were consolidated, arguing that

the trial court erred in denying their motions to dismiss the case on the ground that double jeopardy barred retrial. The appellate court affirmed the trial court's ruling but ordered that a different judge preside over the second trial. *People ex rel. City of Chicago v. Hollins*, 368 Ill. App. 3d 934, 948 (2006).

¶ 26    The matter was transferred to a new judge. Before the second trial, the Attorney General filed a motion to quash the subpoena for the first judge to testify. The trial court granted the motion to quash, finding that the building court's orders were clear and unambiguous and that it would be improper for the judge to testify about his mental processes behind the orders.

¶ 27    The City filed a motion *in limine* to exclude testimony about the judge's half sheet entries and introduction of the half sheet as evidence. The trial court ruled that Royce could testify that, after he received Prendergast's letter and the court's July 19, 2002, order, he went and looked at the half sheet and told Kyles that the half sheet prohibited him from using the VIP rooms. The court ruled that this testimony went to Kyle's state of mind but that the half sheet and letter would not be admitted into evidence.

¶ 28    At the second jury trial on the criminal contempt charges, which began on September 15, 2009, the aforementioned facts concerning the building inspections, code violations, and building court proceedings were presented by various witnesses. In addition, the following pertinent evidence was introduced.

¶ 29    Shahi testified that building inspectors do not close businesses but that she had asked that the entire second floor of the building be closed because the faulty construction of the VIP rooms could have caused them to collapse onto the second floor. She testified that she never asked that only the VIP rooms be closed; instead, she always asked that the entire second floor be closed.

¶ 30    Shahi testified that on October 23, 2002, she and Julio Montilla, another City building inspector, met Hollins and two engineers at the building. Hollins identified himself as the owner of the building and asked her to explain "what needed to be done *** to lift the order" so he could "use the second floor." She went through the violations as they walked through the nightclub and explained what needed to be done to abate them. During this time, Montilla took photographs, including some depicting Hollins. The photographs were introduced into evidence. Shahi testified that she pointed out to Hollins cracks in the roof trusses and problems caused by the build-out of the skyboxes. She told Hollins that he had to get plans and permits for repairing the trusses and for the build-out of the skyboxes and VIP rooms.

¶ 31    Shahi testified that, during the inspection, Hollins told her and Montilla that the second floor was not being used. In response, Montilla said, "If it's not being used, *** I'll sign my name on this napkin and leave it here, and next time we come back it should still be here."

¶ 32    Shahi testified that, as of October 23, 2002, none of the violations had been corrected. No work had been done, and no permits had been obtained.

¶ 33    Montilla also testified that none of the violations had been corrected at that time. He also testified that while he was in the VIP area on the mezzanine of the nightclub on October 23, 2002, he signed and dated a napkin, put it on one of the tables, and took a picture of it. Hollins asked him what he was doing. He told Hollins, "since you're not supposed to be

using this club—this area, the second floor, the place," the napkin "should be there anytime somebody comes back." He testified that his remark meant that the entire second floor was not to be occupied.

¶ 34 Kare testified that before the July 19, 2002, hearing he and Prendergast reached a preliminary agreement to close the VIP rooms and mezzanine. Because they did not have time to finish conferring before the hearing, Kare called Shahi to testify regarding any additional concerns she had.

¶ 35 Kare testified that, in building court, the only issues that can be addressed pertain to the building and that the building is always referenced in the order. He similarly testified that orders in building court are directed to the building, not to businesses inside the building.

¶ 36 Kare testified that the building court's order not to occupy the second floor was not limited to the VIP rooms or mezzanine, but instead prohibited occupancy of the entire second floor of the building. Although his preliminary agreement with Prendergast had been limited to closing the mezzanine and VIP rooms, Shahi's testimony during the hearing led him to change his mind and conclude that a broader prohibition was necessary. On cross-examination, he testified that he realized he was closing the entire nightclub, which was the City's intent.

¶ 37 Lesly Benodin, who owned Lesly Motors, testified that his attorney had told him that the building court had ordered the second floor of the building closed. He further testified that he had told Hollins what his attorney had told him.

¶ 38 Sherman Thomas Bramlet testified that a private contractor hired him to provide security at E2 on Sunday evenings from October through December 2002. He routinely observed people socializing and drinking upstairs in the VIP area. He did not observe security personnel or ropes to bar access to the VIP area; he was never told that the VIP area was closed to the public; nor did he see any signs indicating that the VIP area was closed to the public. Numerous patrons of E2 testified that it continued operating on the second floor of the building between July 19, 2002, when the second floor was ordered closed, and February 17, 2003, despite the building court's orders. They also testified that, during that time, they routinely used the VIP rooms and skyboxes on the mezzanine or saw others doing so, and they never saw ropes, signs, or security guards blocking access to the mezzanine.

¶ 39 John Lucki, a police officer with the City, testified that he interviewed respondents on February 17, 2003. Hollins told Lucki that he was E2's operations manager and that he maintained an office on the mezzanine. Hollins said that a company named Envy booked regular engagements at the nightclub on Friday and Sunday nights. The night before, Envy had hosted a ladies' night promotion, which was a regularly scheduled Sunday night event. Hollins said that the sponsor of an event at E2 was responsible for collecting money, but that E2 provided security on the ground floor to check identification. Hollins said that he and Kyles had a joint business account, in which they both had signatory authority. He also said that he and Kyles had taken out a $150,000 loan to assist in the transition of the nightclub from Clique to E2. Hollins said that there was a signed contract for the February 16, 2003, event. Lucki asked Hollins if there were any other issues or court orders that he was aware of and was told that there were none.

¶ 40   Kyles confirmed that there had been a ladies' night scheduled for the previous evening. He also said that he and Hollins had a joint bank account to handle a number of ventures, including the nightclub. He identified a bank account at Lakeside Bank in the name of Hollins Industries, Ltd., which they used to pay the nightclub's expenses. He said that they had joint signature authority on that account. He also confirmed that they had taken out a $150,000 loan to assist with some financial hardships they were having in the transition from Clique to E2.

¶ 41   Prendergast testified that he appeared in building court on July 19, 2002, as a favor to Royce, who represented the nightclub. He testified that he and Kare reached an agreement before court that Le Mirage would not occupy the VIP rooms on the mezzanine.

¶ 42   Prendergast left court without a copy of the order the judge entered. When he returned to his office, he dictated a short letter to Royce to inform him what had happened because he was leaving for a week's vacation before he would see Royce. The City faxed a copy of the July 19, 2002, order to his office on July 23, 2002, while he was on vacation, but his secretary gave it to Royce.

¶ 43   On cross-examination, Prendergast admitted that he never objected when the judge said: "Your agreement is no occupancy of the second floor. You have to keep it vacant." He claimed that he believed the judge was referring to the second floor of the nightclub where the VIP rooms were. He acknowledged that he heard Shahi testify during the hearing that "the whole second floor would be dangerous and hazardous" and that he did not doubt that her testimony meant she did not want the second floor occupied. He also agreed that she did not testify that she did not want the VIP rooms to be occupied. He also acknowledged that he did not cross-examine her or ask her to clarify but testified that he did not get the impression that she was saying the nightclub should be closed. He testified that he would have cross-examined her if he had gotten that impression. He admitted that, no matter what understanding he might have had, only the order signed by the judge mattered, and, here, the order did not mention VIP rooms.

¶ 44   Royce testified that after Prendergast's appearance in court on July 19, 2002, he received Prendergast's letter describing what had happened and a copy of the court's order. He became concerned because the letter seemed to conflict with the court's order. Therefore, he went to look at the half sheet, which also seemed to conflict with the court's order. He testified that, after reading Prendergast's letter and the half sheet, he thought that any reference to the second floor was to the mezzanine.

¶ 45   Royce testified that he met with Kyles sometime before the hearing on August 9, 2002, and told Kyles that the court's order, Prendergast's letter, and the half sheet were inconsistent and that the half sheet appeared to be consistent with the letter. He testified that, based on the half sheet, he told Kyles that the VIP section had to be closed. He testified that he told Kyles to put up a rope and sign to bar access to the VIP area and that he personally saw that such a sign had been posted.

¶ 46   On cross-examination, Royce acknowledged that when he appeared in court for the August 9, 2002, hearing, he did not raise with the judge any inconsistencies between the court's July 19, 2002, order and the half sheet. He also acknowledged that, during the

hearing, after the judge asked whether there were other dangerous and hazardous conditions besides the second floor, "which ha[d] been addressed by the agreement not to occupy," Kare added, "Right, and the mezzanine" and "VIP rooms," to which Royce responded, "We've agreed to that." He acknowledged that the judge signed an order not to occupy the second floor of the subject premises, and he did not tell the judge he believed the order was incorrect. He testified that he saw no need to bring the inconsistency between the court's order and half sheet to the judge's attention because, according to him, Prendergast's letter was consistent with the half sheet; there was an agreed order; and when he appeared in court on August 9, 2002, Kare corrected the judge on the record. He acknowledged that occupying the VIP areas or skyboxes would violate the court's order.

¶ 47    Kyles testified on his own behalf, acknowledging that he owned the nightclub. He testified that, shortly after the July 19, 2002, hearing, Royce told him that the VIP areas and mezzanine had to be closed. He testified that he informed his staff at their weekly staff meetings that these areas could not be used. He testified that he ordered his security employees to ensure that anyone who rented the space knew that the areas could not be used. He testified that, initially, they put up a sign and rope to prevent access, but that was insufficient, and they ultimately required a private security company to station a security person there to keep people out. He testified that he was not usually there on Saturdays and Sundays.

¶ 48    Kyles testified that, despite hearing from Royce that there was a conflict between the court's July 19, 2002, order and half sheet, he never asked to see the order. He testified that he also never asked to see the August 9, 2002, order.

¶ 49    Kyles testified that between July 19, 2002, and February 16, 2003, no one told him that the nightclub should have been closed and that he therefore continued to operate the nightclub. He testified that in November 2002 the City renewed the nightclub's liquor license and business licenses.

¶ 50    Kyles denied that Benodin ever told him or suggested to him that the nightclub should have been closed and testified that the first time anyone from the City told him that the nightclub was supposed to be closed was on the morning of February 17, 2003, after the tragedy. He testified that from July 19, 2002, to February 17, 2003, he was not aware of any court order that he was violating. He testified that, pursuant to his conversation with Royce, he believed only the mezzanine was to be closed.

¶ 51    Kyles testified that he had known Hollins for almost 25 years and considered him to be his partner. Hollins guaranteed the lease; took out a mortgage on his house for $150,000 for the business; was a signator on the business accounts; and the checking account they used was under the name of Hollins Industries, which was a company with which Hollins was affiliated. He testified that, in 2002, Hollins was involved in running the nightclub. He testified that Hollins was responsible for supervising five to six managers, who ran the restaurant and nightclub, with his focus being on the nightclub. He testified that both he and Hollins attended the weekly staff meetings and that he had never tried to conceal his business relationship with Hollins.

¶ 52    On cross-examination, Kyles was impeached with his statements, made during

-9-

proceedings to revoke his liquor license, that Hollins was just a consultant, not a business owner. He admitted that he had described Hollins as a consultant because Hollins was legally ineligible to manage a bar.

¶ 53    Kyles acknowledged that during the October 25, 2002, hearing, when the judge asked him whether he understood the prior orders were to continue in effect, he had agreed he did. He claimed he thought this referred to the order to close the mezzanine. He admitted that he never objected to Kare's statement that Kare's concerns would be abated if the court continued the previous orders not to occupy the mezzanine, the second floor, and the VIP rooms. He also admitted that he did not tell the court he understood the orders to pertain only to the VIP rooms.

¶ 54    Kyles also admitted that Le Mirage had financial difficulties in 2002. However, he denied that he violated the building court's orders because Le Mirage was in financial trouble and could not afford to close the nightclub.

¶ 55    When shown a contract signed by Janielle Taylor, leasing the VIP area during the time the second floor was to be closed, Kyles claimed that he did not recognize it and that Taylor was an independent contractor, who could not accept contracts for the nightclub. He was impeached by a memorandum he dictated describing Taylor as the nightclub's promotion and events manager and outlining her duties as negotiating agreements for the use of the nightclub and preparing weekly reports before and after events. He admitted that the memorandum did not characterize Taylor as an independent contractor.

¶ 56    The trial court instructed the jury as follows regarding the elements of indirect criminal contempt:

> "A person commits the offense of indirect criminal contempt when he willfully violates a valid court order.
>
> To sustain the charge of indirect criminal contempt of court[,] the City must prove the following propositions:
>
> > (1) there was an order reduced to writing, signed by the judge, and entered of record;
> >
> > (2) that the order described in reasonable detail the acts prohibited;
> >
> > (3) that the respondent received actual notice of the order by personal service or otherwise; and
> >
> > (4) that respondent willfully violated said order.
>
> If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the respondent guilty.
>
> If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the respondent not guilty."

¶ 57    The jury returned guilty verdicts against both respondents. Respondents filed motions for judgment notwithstanding the verdict or a new trial, arguing, *inter alia*, that the trial court should have granted them a directed verdict because the building court's orders were vague.

The trial court denied the motions and sentenced respondents to two years in prison.

¶ 58    Respondents appealed, arguing that (1) the trial court erred in instructing the jury on vicarious corporate liability and failing to include a definition of willfulness; (2) the court improperly barred admission of the building court's half sheet and Prendergast's letter explaining the building court's order; and (3) at sentencing, the court improperly considered factors unrelated to the contempt charges and for which respondents had been acquitted at separate criminal trials. Hollins also argued that the City improperly brought out evidence of his character and past bad acts even though he did not testify or otherwise put his character into issue.

¶ 59    Instead of addressing the issues respondents raised on appeal, the court reversed their indirect criminal contempt adjudications and vacated their sentences, finding that they were not proved guilty beyond a reasonable doubt because the building court's orders were ambiguous and did not provide in reasonable detail the acts prohibited. 2011 IL App (1st) 093547.

¶ 60    The City filed a petition for leave to appeal with this court (Ill. S. Ct. R. 315 (eff. Feb. 26, 2010)), which we allowed.

¶ 61                                    III. ANALYSIS

¶ 62    "[C]ourts have the inherent power to punish contempt; such power is essential to the maintenance of their authority and the administration of judicial powers." *People v. Simac*, 161 Ill. 2d 297, 305 (1994). Contempt of court has generally been defined as conduct that "is calculated to embarrass, hinder or obstruct a court in its administration of justice or derogate from its authority or dignity, thereby bringing the administration of law into disrepute." (Internal quotation marks omitted.) *Id.* "A finding of criminal contempt is punitive in nature and is intended to vindicate the dignity and authority of the court." *Id.* at 305-06.

¶ 63    Indirect criminal contempt occurs out of the court's presence, and its proof is dependent upon evidence of some kind or upon facts of which the court has no judicial notice. *People v. Waldron*, 114 Ill. 2d 295, 302 (1986).

¶ 64    In criminal contempt cases, the State must prove the charges beyond a reasonable doubt. *People v. Lindsey*, 199 Ill. 2d 460, 471 (2002). Therefore, in reviewing the sufficiency of the evidence in a criminal contempt case, the appropriate standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original) (*Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). See *People v. Ernest*, 141 Ill. 2d 412, 429 (1990). "[T]his inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' " (Emphasis in original.) *Jackson*, 443 U.S. at 318-19 (quoting *Woodby v. Immigration & Naturalization Service*, 385 U.S. 276, 282 (1966)). This standard respects the fact finder's responsibility for resolving conflicting testimony, weighing the evidence, and drawing reasonable inferences from the evidence. *Id.* at 319. Only where no reasonable fact finder could convict, in which case the conviction would violate due process, should a reviewing court impinge upon the fact finder's role. *Id.*

¶ 65    As the jury was instructed in this case, in order to sustain a finding of indirect criminal contempt for violating a court order outside the court's presence, two elements must be proved: (1) the existence of a court order; and (2) a willful violation of that order. *People v. Totten*, 118 Ill. 2d 124, 138 (1987).

¶ 66    Under Illinois law, "an injunction order cannot support a finding of contempt unless it sets forth with certainty, clarity and conciseness precisely what actions are enjoined." *O'Leary v. Allphin*, 64 Ill. 2d 500, 513-14 (1976). See also *People v. Wilcox*, 5 Ill. 2d 222, 228 (1955) ("[T]he mandate of the court must be clear before disobedience can subject a person to punishment."). As the Court explained in *International Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967), "[t]he most fundamental postulates of our legal order forbid the imposition of a penalty for disobeying a command that defies comprehension." No such difficulties exist, however, when there is "a violation of a court order by one who fully understands its meaning but chooses to ignore its mandate." *Id.*

¶ 67    Respondents argue, and the appellate court found, that the building court's orders in this case were unclear as to what was meant by "2nd floor." The July 19, 2002, order referenced "2347 S. Michigan Ave." and stated: "Mandatory order not to occupy 2nd floor." The August 9, 2002, order stated: "Mandatory order not to occupy 2nd floor of subject premises," again "2347 S. Michigan." Despite respondents' arguments, and the appellate court's finding, to the contrary, the building court's orders were "so specific and clear as to be susceptible of only one interpretation" (*O'Leary*, 64 Ill. 2d at 514). The "2nd floor" of the "subject premises"—the building at "2347 S. Michigan Ave."—was not to be occupied. The "2nd floor" of the "subject premises" means the "2nd floor" of the building; it does not mean the mezzanine level of the nightclub, as respondents argue. Therefore, the building court's orders in this case were sufficiently certain, clear, and concise to support a finding of contempt.

¶ 68    After hearing all of the evidence, the jury found beyond a reasonable doubt that the building court's orders described in reasonable detail the acts prohibited and that respondents willfully violated the orders. Viewing all of the evidence in the light most favorable to the prosecution, we conclude that a rational jury could have found beyond a reasonable doubt that respondents were fully aware that the orders closed not just the mezzanine, but the entire second floor of the building and that they willfully violated the orders.

¶ 69    On October 25, 2002, Kyles appeared in open court and agreed on the record when Kare told the court that the court should "continue the previous orders not to occupy the mezzanine, the second floor, and the VIP rooms." He did not express any concern to the court that closing the second floor was not his understanding of what the order meant; nor did he ask his attorney to show him the prior orders to clarify any ambiguities his attorney believed there were. As an attorney himself, Kyles should have understood perfectly well what the orders said, the importance of obeying court orders, and the proper procedures for seeking revision of those orders in the event of disagreement with their scope or clarity. Moreover, the jury was free to disbelieve his testimony that he thought the court meant to close only the mezzanine level. There was evidence before the jury that Kyles was less than forthcoming with accurate information. For example, he claimed he had never tried to conceal his business relationship with Hollins but was impeached by his statements, made

during proceedings to revoke his liquor license, that Hollins was just a consultant, not a business owner or manager. He admitted he had a motive to misrepresent Hollins' relationship because Hollins was legally ineligible to be an owner or manager of a bar.

¶ 70　　Similarly, a rational jury could have concluded that Hollins knew that the orders had closed the entire second floor of the building. Benodin testified that he told Hollins that his attorney had told him that the second floor of the building was ordered closed. In fact, there was no evidence that Hollins, unlike Kyles, had been told anything different from what Benodin told him. The building inspector also testified that Hollins personally asked her what he needed to do to lift the orders so that he could use the second floor. From this, the jury could have inferred that Hollins understood the orders perfectly well. Thus, there was ample evidence from which a rational jury could conclude that respondents willfully violated the building court's orders prohibiting occupancy of the second floor.

¶ 71　　Moreover, the evidence showed that respondents' own attorney, Royce, believed that the language of the orders prohibited occupancy of the second floor of the building. This prohibition was so clear to him from the July 19, 2002, order that he went to court to check the half sheet because Prendergast's letter had stated that only the mezzanine had been closed. After checking the half sheet, Royce told Kyles that the order was different from the letter and half sheet and that the letter and half sheet were consistent with each other. The most that Royce fairly could have inferred from this was that the order had meant to prohibit something different from what the order said, but that did not make the language of the order unclear. Royce's obligation was to bring this to the court's attention. Instead, he advised Kyles that only the mezzanine was ordered closed, even though the order said the second floor was closed.

¶ 72　　Even the appellate court agreed that the language of the orders seemed to prohibit occupancy of the second floor, stating, "At first blush the language appears clear." It was only based on other evidence such as the transcripts from the hearings preceding the entry of the orders and the building court's half sheet that the appellate court came to believe that the orders were ambiguous and that the building court may have meant to close only the mezzanine. However, as the City notes, respondents were not charged with contempt for violating these transcripts or the half sheet. They were charged with contempt for willfully violating the court's orders. The jury, in turn, was charged with determining whether respondents' violation was willful. The jury thus had no reason to use the transcripts and half sheet to decide what the judge really meant when he entered the orders or what the orders should have said. Instead, it needed only to decide if the orders clearly expressed a prohibition on second-floor occupancy that respondents willfully violated.

¶ 73　　The transcripts may have been relevant as to whether respondents' violation was willful. If, despite the clarity of the orders, respondents had a good-faith basis to believe that the orders did not prohibit operating the nightclub on the second floor of the building, then the jury could have concluded that their disobedience of the orders was not willful. However, the jury had access to the transcripts as exhibits, and it heard Royce's and Prendergast's testimony that they thought the court had closed only the mezzanine. Any ambiguities going to willfulness were for the jury to weigh, and it rejected respondents' claim to be ignorant of the true scope of the orders. Either way, the evidence does not show that the orders were

-13-

not clear.

¶ 74    In addition, a rational jury could have concluded that respondents willfully violated even the version of the orders that they claimed to believe the court had entered—prohibiting occupancy of the mezzanine. Respondents concede that this command of the building court, if nothing else, was perfectly clear to them. However, numerous witnesses testified that they routinely patronized the VIP area and skyboxes on the mezzanine, or observed others doing so, and never observed ropes, signs, or security personnel blocking access to the mezzanine.

¶ 75    In addition, a rational jury could disbelieve respondents' claimed ignorance of the mezzanine's operation in light of the evidence demonstrating that they actively managed the nightclub. This included evidence that they conducted weekly staff meetings attended by, among others, an employee who was a signatory on contracts leasing out the VIP area and who was charged with submitting weekly reports before and after events describing the events' success. Kyles denied that this was one of his employees and that she had authority to accept contracts for the nightclub, but was impeached by a memorandum describing her as an E2 manager whose duties included negotiating agreements for the use of the nightclub. Moreover, Hollins personally managed five or six nightclub managers. The jury could have believed that respondents were aware of the use of the mezzanine from the reports of managers, review of the nightclub's balance sheets, attendance at the nightclub, or some combination thereof. Kyles even admitted to the jury that the methods he tried to keep patrons from the mezzanine had initially proved insufficient. The jury fairly could have inferred from this that he must have received reports of mezzanine use. The jury also heard evidence that in November 2002, a man's feet fell through the floor of the VIP area and were dangling through the ceiling above the bar area underneath. The jury could have disbelieved respondents' claim not to have known the mezzanine was in use when there was a hole in the second floor ceiling that required repair. The appellate court failed to explain why this evidence was insufficient for the jury to convict respondents of willfully violating the building court's orders based on their occupancy of the mezzanine.

¶ 76    Had the appellate court considered the evidence in the light most favorable to the jury's verdict, it would have concluded that respondents were proved guilty beyond a reasonable doubt of indirect criminal contempt because a rational jury could have found that they were fully aware of what the building court's orders prohibited and willfully disobeyed the orders. Therefore, the appellate court erred in reversing respondents' adjudications of indirect criminal contempt based on its finding that they were not proved guilty beyond a reasonable doubt because the building court's orders were not sufficiently clear.

¶ 77                                IV. CONCLUSION

¶ 78    For the foregoing reasons, we reverse the judgment of the appellate court and remand to the appellate court for consideration of the issues respondents raised but the appellate court did not address.

¶ 79    Reversed and remanded.