# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*People ex rel. City of Chicago v. Le Mirage, Inc.*,  2013 IL App (1st) 093547-B

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE *ex rel.* THE CITY OF CHICAGO, Petitioner-Appellee, v. LE MIRAGE, INC., a/k/a La Mirage All Nite Studio, Ltd., DWAIN JOHNSON KYLES, and CALVIN HOLLINS, JR., Respondents-Appellants. |
| District & No. | First District, Fourth Division<br>Docket Nos. 1-09-3547, 1-09-3549 cons. |
| Filed | November 14, 2013 |
| Rehearing denied | December 11, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Respondents' convictions for indirect criminal contempt based on their violation of a trial court order to vacate the second floor of a building in which they operated a restaurant on the first floor and a night club on the second floor were upheld, since the trial court's order was unambiguous, the trial court's limiting instruction cured any damage arising from the admission of one respondent's other-crimes and bad-character evidence, and the trial court's error in refusing to give an instruction on the definition of "willfully" did not rise to the level of plain error; however, respondents' sentences were vacated and the cause was remanded for a new sentencing hearing on the ground that evidence concerning the deaths of many people during a panic that occurred at the building when attempts were made to quell a fight was improperly considered in aggravation. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 03-MC1-19280102, 03-MC1-19280103; the Hon. Daniel T. Gillespie, Judge, presiding. |
| Judgment | Convictions affirmed; sentences vacated; remanded for resentencing. |

| Counsel on Appeal | Abishi C. Cunningham, Jr., Public Defender, of Chicago (Lester Finkle and Vicki Rogers, Assistant Public Defenders, of counsel), for appellant Calvin Hollins, Jr. |
| | |
| | Victor P. Henderson, Christopher W. Carmichael, Chelsea C. Ashbrook, and Darren H. Goodson, all of Holland & Knight LLP, of Chicago, for appellant Dwain Johnson Kyles. |
| | |
| | Stephen R. Patton, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Kerrie Maloney Laytin, Assistant Corporation Counsel, of counsel), for appellee. |

| Panel | JUSTICE EPSTEIN delivered the judgment of the court, with opinion. |
| | Presiding Justice Howse and Justice Lavin concurred in the judgment and opinion. |

## OPINION

¶ 1    Respondents Dwain J. Kyles and Calvin Hollins, Jr., owned and operated a first-floor restaurant (Epitome) and second-floor nightclub (Epitome 2 or E2) at 2347 South Michigan Avenue in Chicago, Illinois. On July 19, 2002, the circuit court ordered respondents to vacate the second floor because of building code violations. They continued to operate E2 until February 17, 2003, when 21 people were crushed to death in a panic after security guards sprayed pepper spray in an attempt to subdue a fight. Following a jury trial, respondents were convicted of indirect criminal contempt and sentenced to two years' imprisonment based on their violation of the circuit court's order. They now raise evidentiary, jury instruction, and sentencing challenges. We affirm their convictions, but, because the trial court improperly relied on the nightclub tragedy in aggravation, we vacate respondents' sentences and remand for a new sentencing hearing.

¶ 2                                   BACKGROUND

¶ 3    This case comes to us on remand from the Illinois Supreme Court. See *People ex rel. City of Chicago v. Le Mirage, Inc.*, 2013 IL 113482. The supreme court reversed the holding by another panel of this court that respondents were not proven guilty beyond a reasonable doubt–an issue not raised before our court on appeal–and remanded with instructions for us to consider the issues raised by respondents. *Id.* ¶ 78.

¶ 4                                    Building Code Violation

¶ 5        On April 29, 2002, a City of Chicago (City) building inspector discovered that E2's mezzanine VIP rooms[1] were constructed improperly and without a permit. On June 18, 2002, the City filed a building code enforcement action against Lesly Motors, Inc., respondents' landlord. Le Mirage, Inc., the company through which respondents owned and operated E2, was voluntarily impleaded.

¶ 6        Four court dates followed. On July 19, 2002, the parties initially agreed "not to occupy the second floor V.I.P. rooms." When the court asked if there were any other issues, the City presented building inspector Marguerite Shahi, who testified regarding her July 16, 2002, inspection of 2347 South Michigan Avenue:

    "Q. [City] Other than the items that we already addressed, is there anything else that's dangerous and hazardous that you would like to address to the Court?

    A. [Shahi] One is the substandard partitions that were used to build the V.I.P. rooms that are supported by the boisterous [sic] roof. Everything I've learned is that there should be absolutely no weight on structural members especially suspended from a boisterous [sic] roof ceiling. So, the whole second floor would be dangerous and hazardous, since it was built without plans and permits to begin with. And also, there's suspended weight from the boisterous [sic] roof.

    Q. And an Order today to not occupy that second floor would abate your concerns?

    A. Yes.

    Q. Are there any other violations besides the second floor that you are concerned about?

    A. No. The second floor is the major one."

Following Shahi's testimony, the court announced, "Your agreement is no occupancy of the second floor. You have to keep it vacant." The court also issued a written order stating, "Mandatory order not to occupy 2nd floor."

¶ 7        On the following court date, August 9, 2002, the City noted that a hearing "as to the conditions on the second floor" had been scheduled, but requested a continuance. The court granted a continuance and issued an order stating, "Mandatory order not to occupy 2nd floor of subject premises."

¶ 8        On September 6, 2002, the City said its motion "that the second floor and the mezzanine not be occupied" had previously been granted. The court issued an order stating, "All previous orders remain in full force and effect."

¶ 9        On October 25, 2002, the City noted the court had issued an "order not to occupy the mezzanine and the second floor VIP rooms." When the court asked if there were any dangerous and hazardous conditions, the City responded, "They would be abated, if the Court does continue the previous orders not to occupy the mezzanine, the second floor, and the VIP rooms." Kyles, present in court that day, agreed. The court announced, "All prior orders to

---

[1]The parties use "mezzanine," "skyboxes," and "VIP area" interchangeably. We do the same.

stand," and issued an order stating, "All prior orders to remain in full force and effect." The matter was continued until March 7, 2003.

¶ 10                    Indirect Criminal Contempt

¶ 11    The E2 tragedy occurred in the early hours of February 17, 2003. The following day, the City filed a petition for adjudication of indirect criminal contempt against Kyles and Le Mirage, Inc. The City later amended the petition, adding Hollins and omitting Le Mirage. After a mistrial, another panel of this court rejected respondents' double jeopardy arguments, but ordered that a different judge preside over the retrial. See *People ex rel. City of Chicago v. Hollins*, 368 Ill. App. 3d 934 (2006). The instant appeal concerns the results of that retrial.

¶ 12                    Motion *in Limine*

¶ 13    Respondents listed a half-sheet and a letter from their attorney among exhibits they intended to introduce at trial. The half-sheet stated, "BA [by agreement] Mirage will not occupy 2nd floor VIP rooms." In pertinent part, attorney Bradley Prendergast's letter to attorney Thomas Royce stated, "The judge entered an Order that the second floor mezzanine not be used, the VIP room, until there is a hearing." The City moved *in limine* to exclude this evidence, arguing that, because the order itself was controlling, the half-sheet and letter were irrelevant and would only confuse the jury. Hollins argued that the exhibits would show that the building court's order was ambiguous; Kyles argued they would show that he did not *willfully* violate the order, because he misunderstood its scope. Following a hearing, the trial court granted the City's motion, finding that the order alone was controlling and that the half-sheet and letter could not be introduced to show respondents' lack of willfulness.

¶ 14                    Jury Trial

¶ 15    Building inspector Marguerite Shahi testified that, based on her July 16, 2002 inspection, she believed E2's VIP skyboxes were "dangerous and hazardous" and built without a permit. On July 19, 2002, she asked the building court to close the entire second floor, not just the VIP rooms. Shahi said that she was concerned that the weight of a "live load" could cause the trusses to become unstable, and the skyboxes, which extended 15 feet over the dance floor, could collapse onto the second floor. The City introduced the July 19, 2002 transcripts and order.

¶ 16    Shahi further testified that, when she returned to E2 on August 8, 2002, none of the violations had been corrected. On August 9, 2002, the court entered an order stating, "Mandatory order not to occupy second floor of subject premise." She visited E2 again on September 5, 2002, but did not gain entry. The following day, she again went to court, and the trial judge stated that all previous orders were to remain in full force and effect. She visited E2 a final time on October 23, 2002, where she met Hollins, who identified himself as the building's owner and said that he "wanted to know what he had to do to comply in order to lift the order to use the second floor." Shahi showed him a crack in one of the trusses and told him that they could collapse from supporting too much weight. She advised him to

-4-

obtain plans and permits for repairing the trusses and the skybox VIP rooms. None of the violations had been corrected, nor had permits been obtained, by October 23, 2002. On October 25, 2002, the court entered another order stating that all previous orders would remain in effect.

¶ 17 City building inspector Julio Montilla testified that he accompanied Shahi to E2 on September 5 and October 23, 2002. According to Montilla, the skyboxes were suspended from fractured roof trusses and were not original to the building. Montilla identified several photographs he took of the damaged trusses.

¶ 18 Attorney Demetrius Kare represented the City in the underlying building code action. He testified that the City intended for the entire second floor, not just the VIP rooms, to be closed. Accordingly, on July 19, 2002, the circuit court ordered respondents not to occupy the second floor. That day, respondents' attorney, Bradley Prendergast, did not wait to receive a copy of the court's order. The court entered a similar order on August 9, 2002. Kyles was present in court on October 25, 2002, when Kare again asked that no one occupy the second floor or the mezzanine. Kare denied that he and respondents ever entered into an agreed order.

¶ 19 Lesly Benodin testified that he leased 2347 South Michigan Avenue through his company, Lesly Motors, Inc., to respondents, but had no role in operating E2. He identified a 10-year lease, in which respondents agreed to be responsible for all repairs and additions. The mezzanine was built prior to respondents' lease, but respondents added the skyboxes. When Benodin received notice of building code violations at 2347 South Michigan Avenue, he hired attorney Ed Morris, who told him that the entire second floor must be closed. Benodin, in turn, told Hollins that the entire second floor must be closed.

¶ 20 Detective John Lucki testified that he and Detective Ed McMahon interviewed Hollins on February 17, 2003, in the presence of Hollins' attorney, Thomas Royce. Hollins said that he was E2's operations manager and had an office in E2's second-floor loft. Hollins also told him that he and Kyles had a joint bank account and had obtained a $150,000 loan to finance E2 operating costs. Finally, Hollins told him that, since August 2002, a company called Envy had hosted engagements on Fridays and Sundays and hosted a ladies' night on February 16, 2003. Detective Lucki also spoke with Kyles, who stated that he was an attorney and E2's owner and confirmed that he and Hollins had a joint bank account. Kyles further stated that Envy hosted ladies' nights at E2 on Sundays, including February 16, 2003, but he had little knowledge of the event. According to Kyles, Envy normally provided entertainment and security for these events.

¶ 21 Stan Bochnowski testified that he served as vice president of commercial loans at Lakeside Bank in 2000. That year, Hollins, individually and on behalf of Le Mirage, Inc., mortgaged a Darien, Illinois, property for $150,000 to cover E2's operating costs. Hollins repeatedly told Bochnowski that he was E2's owner and general manager.

¶ 22 Seven witnesses for the City testified that E2's main floor and mezzanine were occupied post-July 19, 2002. Sherman Bramlett testified that he provided E2's security through a private contractor every Sunday from October through December of 2002. During that time, hundreds of clubgoers occupied E2, and people routinely entered the VIP rooms. The VIP

area was never blocked by ropes, signs, or security guards. On one occasion, a man fell through the floor of the VIP area, his feet dangling above the floor below.

¶ 23    Kionna Henry and Lashanda Hudson testified that they visited E2 seven and three times, respectively, post-July 19, 2002. On weekends, the club would fill to nearly 800 people. They never visited the VIP skyboxes, but observed people in that area. No ropes, signs, or security guards barred access to the VIP area. On February 16, 2003, the crowd swelled to over 1,000, including approximately 50 or 60 people in the VIP rooms.

¶ 24    Chiquita Henry testified that she attended E2 approximately 10 to 15 times post-July 19, 2002. She visited the VIP area several times and observed others in that area. Nothing indicated that the VIP rooms were closed. On February 16, 2003, approximately 1,000 people were in the club, including 100 to 150 in the VIP room.

¶ 25    Shanethia Allen testified that she and her friends were admitted into E2's VIP rooms on February 16, 2003. No signs or security guards barred access to the VIP area. Approximately 15 or 20 people were in the VIP area. Over 1,000 people filled the club that night.

¶ 26    Asonjin Gamble testified that she went to E2 over 50 times after July 19, 2002, and occasionally visited the mezzanine VIP rooms, where the club operated an additional bar. There was no indication that the VIP rooms were closed. The club was crowded on February 16, 2003. Gamble went to the VIP rooms that night. Again, nothing indicated that the VIP rooms were closed, and over 30 people were in the VIP area that night.

¶ 27    Off-duty police officer Samuel Smith testified that he and three others visited E2 on February 14, 2003, and occupied a VIP skybox. There were 15 or 20 people in the skyboxes. No security guard or sign barred access to the VIP area.

¶ 28    Attorney Bradley Prendergast testified for the defense that he represented respondents on July 19, 2002, because Thomas Royce, with whom he shared an office, was unavailable. According to Prendergast, prior to the hearing, he, the City, and Lesly Motors' attorney developed an agreed order barring access only to the VIP rooms. No one mentioned closing the entire club. He admitted, however, that he did not obtain a copy of the court's written order that day. Although Shahi testified that the "whole second floor" should be vacated, and the judge said, "Your agreement is no occupancy of the second floor," Prendergast believed that "second floor" referred to the mezzanine VIP rooms. When he returned to his office, he dictated a letter to Royce indicating that the court had barred access to the VIP rooms. The court's order was faxed to the office he shared with Royce on July 23, 2002.

¶ 29    Attorney Thomas Royce testified that he represented respondents in the underlying building code enforcement action. Because he was unavailable for the July 19, 2002, court date, Prendergast went in his stead and left a letter on Royce's desk describing the proceedings. Royce received a copy of the court order on approximately July 24th or 25th and noticed that it was inconsistent with Prendergast's letter. He then looked at the July 19, 2002 half-sheet and found that it was consistent with the letter, but inconsistent with the order. The letter and half-sheet both referenced the VIP rooms, while the order referenced the second floor. Sometime between July 19, and August 9, 2002, he told Kyles about this inconsistency, but advised him to vacate only the VIP section. On his visit to E2, Royce observed a sign barring access to the VIP rooms. Royce appeared in court on August 9, 2002,

but never brought the inconsistency to the court's attention. The judge signed another order that day prohibiting occupancy of E2's second floor. Royce testified that the first time he heard that the club should be closed was in February of 2003. He acknowledged that occupying VIP rooms would be a violation of the court's order.

¶ 30    Kyles testified that he is a lawyer and E2's owner-operator. According to Kyles, when Le Mirage built the VIP skyboxes in 2000 or 2001, its contractors and architects said that permits were unnecessary, because the changes were cosmetic and the mezzanine was stable, having previously been used for engine part storage. When, in July of 2002, he learned of E2's building code violations, Kyles voluntarily impleaded himself. He contacted Royce to represent him on July 19, 2002, but Prendergast appeared in Royce's stead. After the hearing, Royce instructed Kyles to vacate the mezzanine VIP area. Royce informed him that the court's order and half-sheet were inconsistent, but Kyles never asked to see either. At an E2 staff meeting, Kyles told his employees that the mezzanine VIP rooms were unavailable. Kyles admitted that he possessed no documents memorializing this order to his staff.

¶ 31    Kyles attended the building code enforcement proceedings on October 25, 2002, believing that E2 had reached an agreement with the City, but the City still insisted that he file plans and permits. Although he agreed on that date that previous orders should stand, Kyles believed that the previous orders barred only occupancy of the mezzanine VIP area. Neither the City nor Royce nor Benodin informed Kyles that the club was supposed to be closed.

¶ 32    Between July 19, 2002, and February 16, 2003, Kyles continued to operate E2. According to Kyles, he was unaware that he was violating a court order and believed that the order barred only access to the mezzanine VIP rooms. In 2002, Marco Flores from Envy began leasing E2 to host events on Fridays and Sundays, including a ladies' night. Flores hired a company called Team 1 Security to provide E2 security. Kyles attempted to bar mezzanine access with a sign and a rope, but that was insufficient. Eventually, Team 1 Security stationed a guard to prevent access to the VIP area. He never heard that someone fell through the skybox floor.

¶ 33    Kyles stated that he and Hollins never tried to conceal their business partnership, but was impeached on this point: the City confronted Kyles with an affidavit pertaining to a 2002 liquor license action, in which Kyles swore that Hollins was merely a consultant. Kyles admitted that he did so because Hollins was "legally ineligible" to manage E2.

¶ 34    Kyles further testified that he never asked his managers whether they leased the mezzanine VIP area in their contracts. When confronted with a contract signed by Janielle Taylor leasing E2's VIP area post-July 19, 2002, Kyles claimed that he did not recognize the contract and that Taylor was an independent contractor who lacked authority to accept contracts. He was impeached by a memorandum in which he described her as a promotion and events manager who negotiated agreements for the club.

¶ 35    According to Kyles, it was not until February 17, 2003, that he learned that E2 was supposed to be closed. Kyles never obtained a permit for the skyboxes.

¶ 36                                    Verdict and Sentence

¶ 37     During the jury instruction conference, the City requested Illinois Pattern Jury Instructions, Criminal, No. 5.11 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 5.11), which concerns acts an individual commits on behalf of a corporation. Kyles and Hollins objected, arguing that Le Mirage was no longer a respondent and that neither individual had tried to hide behind a corporation. The trial court instructed the jury pursuant to IPI Criminal 4th No. 5.11 over respondents' objections.

¶ 38     Approximately 30 minutes into deliberations, the jury sent a note asking for a definition of the term "willfully." The court instructed the jury that it had "received all the instructions and evidence the Court has admitted. Please continue to deliberate." The jury found respondents guilty of indirect criminal contempt.

¶ 39     Prior to sentencing, respondents argued that the trial court should bar any evidence of the February 17, 2003 tragedy, because the contempt charges concerned violation of a building court order unrelated to the tragedy, and because they had already been acquitted of manslaughter charges stemming from the tragedy. The City maintained that punishment should be measured by the gravity of the contemptuous conduct and the power to punish contempt is not limited by statute. The trial court denied respondents' motions, but asked the City to "streamline" the evidence regarding the tragedy. The court further noted that evidence of the tragedy was excluded during the guilt phase because "the facts of that night would be so prejudicial that it would outweigh the probative factor," but that "those facts are entitled to be presented at sentencing."

¶ 40     The City argued in aggravation, "We are here six years later, 21 people dead. And the reason those 21 people are dead is because these two men willfully violated four court orders that had been put in place to protect the public." After discussing the building code violation, the City concluded, "The bottom line is that because of their willful and wanton violations of these court orders we have 21 people dead. As such, Judge we ask you and we believe that justice cries out for it, both of these men should receive substantial periods of incarceration."

¶ 41     Kyles argued in mitigation that the City argued that "they are concerned about how 21 black people lost their lives in February of 2003 in a tragic accident which by the way the Illinois Appellate Court already has told you had nothing to do with the building code violations." Kyles continued, "to want to see them behind bars for a tragic accident is improper and not supported by anything in the case law ***. ***And no case has been cited that indicates that building code violations result and may [*sic*] spending time in jail. It doesn't exist."

¶ 42     After respondents presented several mitigation witnesses, the City again argued, "Judge, you know, I respect all the people that stood up today and, you know, I respect everything they said. I just want to remind your Honor that there are 21 people who couldn't stand up today. They were a terrible loss to the community. *** [B]ut for what [respondents] did, those 21 people would be alive today *** if they had stepped up and if they had closed the place which they chose not to do. *** They need to be told and they need to be sent a message about those 21 people who would still be alive here today."

¶ 43     The trial court sentenced respondents to two years' imprisonment. The court did not explicitly refer to the E2 tragedy during its pronouncement, but noted that probation would

be improper given the "serious nature of this matter."

¶ 44                                    Instant Appeal

¶ 45     Respondents timely appealed, and their appeals were consolidated. On November 16, 2011, this court reversed the trial court's judgment, finding that the City failed to prove them guilty beyond a reasonable doubt. See *People ex rel. City of Chicago v. Le Mirage, Inc.*, 2011 IL App (1st) 093547, ¶ 67. The Illinois Supreme Court granted leave to appeal and found that respondents had not challenged the sufficiency of the evidence and, even if they had, the evidence was sufficient to support their convictions. The court reversed this court's judgment and remanded with instructions to consider the issues raised by respondents. See *People v. Le Mirage, Inc.*, 2013 IL 113482, ¶ 78. The supreme court also held that the building court's order "not to occupy 2nd floor" referred to the second floor of the building located at 2347 South Michigan Avenue, not the mezzanine VIP area located within E2. *Id.* ¶ 67.

¶ 46                                      ANALYSIS

¶ 47     Respondents raise evidentiary, jury instruction, and sentencing issues on appeal. We affirm their convictions, but, because the trial court improperly considered the E2 tragedy in aggravation, we vacate respondents' sentences and remand for a new sentencing hearing.

¶ 48                                     I. Evidence

¶ 49     Respondents argue that the trial court erred in excluding evidence that would have clarified the building court's ambiguous order and demonstrated that they did not willfully violate that order. Hollins also argues that the trial court erred in admitting other-crimes or bad-character evidence. We disagree.

¶ 50                        A. Half-Sheet and Attorney Letter

¶ 51     The City moved *in limine* to bar introduction of the building court's half-sheet entry and Prendergast's letter to Royce, arguing that the order was controlling. The trial court barred admission of this evidence, but allowed testimony regarding both the half-sheet and the letter. Respondents argue on appeal that the trial court erred in granting the State's motion. Specifically, they contend the half-sheet and letter would have clarified the building court's ambiguous order. Alternatively, they claim this evidence should have been admitted to show that they did not willfully violate the order. The City responds that the order was controlling and the half-sheet and letter would have only confused the jury.

¶ 52     The admissibility of evidence is within a trial court's sound discretion. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). A trial court's decision regarding the admission of evidence will not be overturned absent an abuse of discretion. *Id.*

¶ 53     Indirect criminal contempt requires (1) the existence of a clear court order, and (2) the willful violation of that order. *People v. Totten*, 118 Ill. 2d 124, 138 (1987). As to the first prong, would-be contemnors must receive fair and precise notice of what an order prohibits. *O'Leary v. Allphin*, 64 Ill. 2d 500, 513-14 (1976). Courts must not punish the violation of

"a command that defies comprehension." *International Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967); see also *People v. Wilcox*, 5 Ill. 2d 222, 228 (1955) ("[T]he mandate of the court must be clear before disobedience can subject a person to punishment.").

¶ 54 Respondents first argue that the order was ambiguous and the half-sheet and letter should have been admitted to clarify its meaning. They base their argument on the parol evidence rule. See *CFC Investment, L.L.C. v. McLean*, 387 Ill. App. 3d 520, 528-29 (2008) (describing the rule). Under that rule, where a writing is unambiguous on its face, it must be interpreted without reliance on parol evidence. *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999). If, however, the writing is susceptible to multiple meanings, parol evidence may be admissible to resolve the ambiguity. *Id.* at 462-63. Illinois applies the "four corners rule," in which courts look to the language of the writing alone to determine whether it is ambiguous. *Lease Management Equipment Corp. v. DFO Partnership*, 392 Ill. App. 3d 678, 685 (2009).

¶ 55 We are not convinced that the trial court abused its discretion in refusing to admit the letter and half-sheet to clarify the building court's order. Even if we were, our supreme court has unanimously held that the order was unambiguous:

> "[T]he building court's orders were 'so specific and clear as to be susceptible of only one interpretation [citation].' The '2nd floor' of the 'subject premises'–the building at '2347 S. Michigan Ave.'–was not to be occupied. The '2nd floor' of the 'subject premises' means the '2nd floor' of the building; it does not mean the mezzanine level of the nightclub, as respondents argue. Therefore, the building court's orders in this case were sufficiently certain, clear, and concise to support a finding of contempt." *Le Mirage, Inc.*, 2013 IL 113482, ¶ 67.

For similar reasons, we find that the order was facially unambiguous for purposes of the parol evidence rule. We therefore reject respondents' contention that the letter and half-sheet were admissible to resolve the order's ambiguity.

¶ 56 Turning to the second element of indirect criminal contempt, respondents argue that, even if the order was unambiguous, the letter and half-sheet were relevant to show that they did not *willfully* violate the building court's order. Our supreme court described this issue succinctly: "If, despite the clarity of the orders, respondents had a good-faith basis to believe that the orders did not prohibit operating the nightclub on the second floor of the building, then the jury could have concluded that their disobedience of the orders was not willful." *Le Mirage, Inc.*, 2013 IL 113482, ¶ 73.

¶ 57 Respondents are not similarly situated for purposes of this question. There is no evidence that Hollins either saw the letter or half-sheet or communicated with his attorneys or Kyles about this evidence. See *Le Mirage, Inc.*, 2013 IL 113482, ¶ 70. There is therefore no reason to believe that the letter or half-sheet affected his mental state. Indeed, the only evidence at trial regarding Hollins' mental state showed that he knew the second floor must be vacated. Benodin testified that he told Hollins that the second floor must be closed, and Shahi testified that Hollins asked her what he must do to reopen the second floor. Thus, Hollins' argument that the letter and half-sheet should have been admitted to show that he did not willfully

violate the order is unconvincing.

¶ 58    Kyles, however, presented evidence that, relying on Royce's advice, he believed the order barred only occupancy of the mezzanine VIP area. Notably, there is no evidence that Kyles actually saw the letter or half-sheet. Because Kyles did not see these documents, this evidence would not have had a direct bearing on whether he willfully violated the building court's order. To the extent that this evidence indirectly affected his mental state via his attorneys, he was allowed to fully explore that theory at trial. Royce testified that, relying on the letter and half-sheet, he told Kyles that there was an inconsistency between the order, the half-sheet, and Prendergast's letter, but advised him to vacate only the VIP section. Given this, we cannot say that the trial court abused its discretion in refusing to admit the letter and half-sheet. See *People v. Morgan*, 197 Ill. 2d 404, 455 (2001) (a trial court abuses its discretion only where its decision is " 'arbitrary, fanciful, or unreasonable' or where no reasonable man would take the trial court's view" (quoting *People v. Illgen*, 145 Ill. 2d 353, 364 (1991))). Because the trial court properly excluded the letter and half-sheet as irrelevant to the order's ambiguity and respondents' mental states, we need not address respondents' contention that the letter and half-sheet did not constitute hearsay.[2]

¶ 59    Even if we believed that the trial court erred in barring admission of the letter and half-sheet, any error would be harmless. Evidentiary errors are harmless if the record affirmatively shows that the errors were not prejudicial. *People v. Carlson*, 92 Ill. 2d 440, 449 (1982). Although the letter and half-sheet were not admitted, respondents were still allowed to elicit testimony regarding this evidence and its effect upon their mental states. The jury therefore heard respondents' theories that the order was ambiguous and that their violation of the order was not willful. Ultimately, there was ample evidence that respondents willfully violated the order. Even accepting respondents' contention that they believed the order only prohibited occupancy of the mezzanine VIP area, seven witnesses for the City testified that both E2's main floor and mezzanine were regularly occupied post-July 19, 2002. Respondents therefore willfully violated the order even as they perceived it. There is no reasonable probability that the jury in this case would have acquitted had the letter and half-sheet been admitted at trial.


¶ 60                    B. Other-Crimes or Bad-Character Evidence

¶ 61    Kyles testified at trial that he and Hollins never tried to conceal their business relationship. The City impeached Kyles with an affidavit pertaining to a 2002 liquor license action, in which he swore that Hollins was merely a consultant. Kyles admitted that he did so because Hollins was "legally ineligible" to manage E2. Hollins now argues that the City improperly elicited other-crimes or bad-character evidence, where Kyles testified that Hollins

---

[2]Kyles briefly argues that the trial court erred in quashing a subpoena for Judge Lynch, who presided over the building court proceedings, and who could have testified regarding the order's meaning. He abandons this argument in his reply brief. Regardless, the order was not ambiguous, and judges do not normally testify regarding their thinking upon issuing orders. See *Thomas v. Page*, 361 Ill. App. 3d 484, 488 (2005) (judges may not testify regarding their mental processes in reaching a decision). We are therefore unpersuaded by Kyles' argument.

was "legally ineligible" to own or operate a business with a liquor license, and the City compounded the harm by referencing his ineligibility in closing argument. The City responds that Hollins forfeited this claim, the phrase "legally ineligible" is innocuous, and any harm was mitigated by a limiting instruction.

¶ 62    We turn first to the City's forfeiture claim, the sole basis of which is that Hollins failed to object to each question concerning his legal ineligibility. To preserve an error for appellate review, a criminal defendant must object at trial and include the issue in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). The issue raised on appeal need not be identical to the objection raised at trial. *People v. Lovejoy*, 235 Ill. 2d 97, 148 (2009). Rather, a claim is preserved so long as the trial court had an opportunity to address the essential claim. *Id.*

¶ 63    In this case, the City impeached Kyles with an affidavit he submitted to the City of Chicago:

> "Q. [City] And in that affidavit you say to her that since remodeling and reopening as Epitome, Calvin Hollins has been retained by the corporation as a consultant for the restaurant services and operation. Mr. Hollins receives a check for $750 per week for his services.
>
> That's what you told her, right? ***
>
> A. [Kyles] That's correct.
>
> Q. And the reason you did this is because you knew that Mr. Hollins was legally ineligible to be a manager in your bar. You knew that, didn't you?
>
> A. Yes."

Following this colloquy, a sidebar was conducted, during which Hollins' attorney stated, "There is a motion *in limine* in this case and they're butting right up against it." The City responded, "I always warned them the magic day could come up if he got up here and told me lies. I am not going to mention one word about manslaughter. I'm just going to say legally ineligible. That's my words. Wasn't that cute, Judge?"

¶ 64    We believe Hollins preserved this issue for appellate review. The trial court had an opportunity to address Hollins' claim that discussion of his ineligibility was unfairly prejudicial. He was not required to object to every variation on this question. We therefore reject the City's forfeiture argument.

¶ 65    Turning to the merits, Hollins' argument that the City improperly introduced other-crimes evidence is misplaced. The City never mentioned his manslaughter conviction, nor does the phrase "legally ineligible" necessarily suggest a criminal record or other bad acts. Thus, *People v. Harris*, 224 Ill. App. 3d 649 (1992), which Hollins cites, is distinguishable, as the prosecution there introduced the defendant's prior criminal convictions.

¶ 66    Here, the City, at worst, presented evidence of Hollins' bad character in that he was "legally ineligible" to manage a bar. Character evidence is generally inadmissible when a defendant's character is not at issue. *People v. Lucas*, 151 Ill. 2d 461, 483 (1992). Evidence of a defendant's bad character is inadmissible until the defendant presents evidence of his good character. *Id.* at 484.

¶ 67    We agree with the City that the phrase "legally ineligible" is innocuous. The phrase was

introduced during the City's impeachment of Kyles regarding his claim that he never tried to hide his business relationship with Hollins. There is no reason to think that the jury, as Hollins suggests, believed that he "had some horrid unmentioned skeleton in his closet." The City never explored or even hinted why Hollins was ineligible to manage a bar.

¶ 68    Regardless, any damage would have been cured by the trial court's limiting instruction, which directly addressed this issue:

> "You heard evidence regarding an affidavit by Respondent Kyles and statements contained in that affidavit. Evidence regarding that affidavit and statements contained in that affidavit are limited and they may not be considered by you against Respondent Hollins."

Accordingly, we reject Hollins' claim that the City improperly presented other-crimes or bad-character evidence.

¶ 69                                    II. Jury Instructions

¶ 70    Respondents argue that the trial court erred in instructing the jury regarding accountability for acts performed on behalf of a corporation pursuant to IPI Criminal 4th No. 5.11. They also contend that the trial court erred in failing to instruct the jury on the legal definition of the term *willfully* pursuant to Illinois Pattern Jury Instructions, Criminal, No. 5.01B (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 5.01B), after the jury asked the court to define that term. Although the trial court erred in the second instance, we hold that the error was harmless.

¶ 71    The purpose of instructions is to inform the jury of the correct legal rules and guide it in reaching a verdict. *People v. Lovejoy*, 235 Ill. 2d 97, 150 (2009). Instructions are proper if there is some evidence in the record to justify them. *People v. Mohr*, 228 Ill. 2d 53, 65 (2008). Even very slight evidence of a theory will justify giving an instruction. *People v. Hari*, 218 Ill. 2d 275, 296 (2006). Instructions not supported by either the evidence or the law should not be given. *Id.*

¶ 72    Whether an instruction should be given is a matter within the trial court's discretion. *Mohr*, 228 Ill. 2d at 65. A trial court's decision regarding jury instructions should not be disturbed absent an abuse of discretion. *In re Timothy H.*, 301 Ill. App. 3d 1008, 1015 (1998). A trial court abuses its discretion when the instructions may mislead the jury or fail to accurately state the law. *Id.*

¶ 73                              A. IPI Criminal 4th No. 5.11

¶ 74    During the jury instruction conference, the City requested IPI Criminal 4th No. 5.11, which concerns acts an individual commits on a corporation's behalf. Kyles and Hollins objected, arguing that Le Mirage was no longer a respondent, and that neither individual had tried to hide behind their corporation. The trial court gave the instruction over respondents' objections.

¶ 75    Respondents argue on appeal that the trial court erred in instructing the jury pursuant to IPI Criminal 4th No. 5.11, because the City offered no evidence that respondents acted on

Le Mirage's behalf and, although the City named Le Mirage as a respondent in its original petition, it later amended the petition to omit Le Mirage. According to respondents, the instruction could have confused the jury. The City argues that Kyles forfeited review of this issue by failing to expressly object to the instruction. The City further argues that respondents were Le Mirage's sole shareholders and acted on their corporation's behalf.

¶ 76    Kyles did not forfeit this issue. Kyles' attorney repeatedly argued during the jury instruction conference that IPI Criminal 4th No. 5.11 was inapplicable, insisting that "no one *** has tried to hide behind a corporate shield, Judge." He further contended that the jury would be confused because even "[t]he lawyers don't understand this instruction." Kyles also included this argument in his posttrial motion. Even if he had not, substantial defects in jury instructions may be noticed despite failure to make a timely objection. *People v. Thurman*, 104 Ill. 2d 326, 329 (1984). We therefore turn to the merits.

¶ 77    Because corporations are "persons" for purposes of criminal liability, a corporation may be held accountable for its agents' crimes and vice versa. 720 ILCS 5/2-15, 5-4, 5-5 (West 2002). Specifically, section 5-5 of the Criminal Code of 1961 provides in pertinent part that a person "is legally accountable for conduct which is an element of an offense and which, in the name or in behalf of a corporation, he performs or causes to be performed, to the same extent as if the conduct were performed in his own name or behalf." 720 ILCS 5/5-5 (West 2002). This provision means that " 'an individual acting for a corporation is fully responsible for his own criminal acts and is punishable accordingly.' " *People v. Parvin*, 125 Ill. 2d 519, 528 (1988) (quoting Ill. Ann. Stat., ch. 38, ¶ 5-5, Committee Comments, at 320 (Smith-Hurd 1972)); see also *People v. Runner*, 266 Ill. App. 3d 441, 445 (1994) (corporate agents may be held criminally liable for acts they commit on the corporation's behalf); *People v. Floom*, 52 Ill. App. 3d 971, 977 (1977) (same).

¶ 78    IPI Criminal 4th No. 5.11, which is based on section 5-5, states that "[a] person is legally responsible for conduct which he performs or causes to be performed in the name of or on behalf of a corporation to the same extent as though the conduct were performed in his own name or behalf." Respondents base their argument on the Committee Note to IPI Criminal 4th No. 5.11, which states, "Give when an individual is jointly charged with his corporate employer *or* is charged individually for conduct committed on behalf of his corporate employer." (Emphasis added.)

¶ 79    Kyles alone argues that instructing the jury pursuant to IPI Criminal 4th No. 5.11 was improper, because he, Hollins, and Le Mirage were not jointly charged. Kyles is correct in one regard: Le Mirage was omitted from the City's third amended petition. But he ignores the word "or" in the Committee Note. *Id.* Charging a corporation and its agents jointly is only one ground for instructing a jury under IPI Criminal 4th No. 5.11.

¶ 80    Even setting this aside, Kyles' theory that he cannot be held accountable for acts he performed on Le Mirage's behalf unless Le Mirage is charged is untenable. The City's decision not to prosecute Le Mirage is inconsequential. A person may be held accountable for the acts of another regardless of whether the other person has been prosecuted. 720 ILCS 5/5-3 (West 2002); see *People v. Schmitt*, 131 Ill. 2d 128, 139 (1989) (Illinois does not distinguish between principals and accessories, and the indictment or conviction of one

accomplice is not a prerequisite to the indictment or conviction of another). In particular, prosecution of a corporation is not a condition precedent to prosecution of the corporation's agent. See Ill. Ann. Stat., ch. 38, ¶ 5-5, Committee Comments, at 294 (Smith-Hurd 1989) (agent's prosecution, conviction, and sentence are not dependent on the corporation's); see also 1 John F. Decker & Christopher Kopacz, Illinois Criminal Law § 3.12, at 3-59 (5th ed. 2012) ("The fact that the corporation itself is not or cannot be prosecuted is immaterial, for prosecution of the principal (the corporation) is no longer a condition precedent to prosecution of the accomplice (the corporate agent) in Illinois.").

¶ 81    Kyles further argues that IPI Criminal 4th No. 5.11 improperly allowed the jury to hold him accountable for acts performed by third parties, including Envy Productions, while he knew nothing of the building code violations. In other words, Kyles maintains that IPI Criminal 4th No. 5.11 allowed the jury to find him guilty without proof of either an *actus reus* or a *mens rea*. Kyles misreads IPI Criminal 4th No. 5.11. Neither the instruction on its face nor the law underlying the instruction supports this conclusion. The instruction itself states that a person is accountable for conduct "which *he* performs or causes to be performed in the name or on behalf of a corporation." (Emphasis added.) IPI Criminal 4th No. 5.11. Kyles would therefore not be liable for others' acts of which he was unaware. See 2 Wayne R. LaFave, Substantive Criminal Law § 13.5 nn.113-15 (2d ed. 2012) (accomplice liability cannot rest on one's status as a corporate officer alone, but like any accountability offense requires proof that crimes were committed at one's direction or with one's permission). The instruction merely prevents corporate agents from hiding behind the excuse that they were merely acting "in the name of or on behalf of a corporation." IPI Criminal 4th No. 5.11; see also *Parvin*, 125 Ill. 2d at 528 (section 5-5(a) ensures that " 'an individual acting for a corporation is fully responsible for his own criminal acts and is punishable accordingly' " (quoting Ill. Ann. Stat., ch. 38, ¶ 5-5, Committee Comments, at 294 (Smith-Hurd 1989))). As in all accountability cases, the trier of fact was still required to find an *actus reus*–the promotion or facilitation of an illegal act. See *People v. Peterson*, 273 Ill. App. 3d 412, 419-20 (1995) (accountability requires proof that an accomplice in some way aided, encouraged, or incited a crime).

¶ 82    Similarly, nothing in instruction IPI Criminal 4th No. 5.11 negated the *mens rea* requirement. IPI Criminal 4th No. 5.11 does not describe a separate offense, but rather provides an alternate theory for proving respondents guilty of contempt. See *People v. Ceja*, 204 Ill. 2d 332, 361 (2003) (accountability is not a separate offense, but an alternate theory). The jury here was still instructed that, to convict respondents, it must find that they willfully violated a valid court order. Nothing in IPI Criminal 4th No. 5.11 undermined that instruction. Thus, as in all accountability cases, the trier of fact was still required to find a *mens rea*. See *People v. Perez*, 189 Ill. 2d 254, 267-68 (2000) (accomplice liability requires a mental state). Kyles' contention that IPI Criminal 4th No. 5.11 "allowed a conviction that was not based on a knowing and willful act by Kyles" is therefore unfounded.

¶ 83    Turning to the Committee Note's second half, both respondents argue that the City presented no evidence that they acted "in the name of or on behalf of a corporation" and, thus, IPI Criminal 4th No. 5.11 was improper. Respondents' argument is unconvincing. They did not own and operate E2 as individuals, but rather through Le Mirage, a corporation. The

City presented evidence that Le Mirage faced financial difficulties in 2002, and Hollins had to mortgage his home to finance E2's operations. The City painted Le Mirage as a financially troubled corporation that continued to operate E2 despite a circuit court order barring the club's occupancy.

¶ 84	Given this evidence, it was not error for the trial court to instruct the jury that respondents may be held accountable if they acted "in the name of or on behalf" of Le Mirage, just as if they had acted in their own names or on behalf of themselves as individuals. Very slight evidence of a theory will justify giving an instruction. *Hari*, 218 Ill. 2d at 296. Here, more than slight evidence showed that respondents owned and operated E2 through a corporation and were acting on the corporation's behalf when they violated the building court's order. We therefore cannot say that the trial court abused its discretion.

¶ 85	Even if the trial court had erred in instructing the jury pursuant to IPI Criminal 4th No. 5.11, we would find that such error was harmless. Error in giving a jury instruction is harmless where the result at trial would not have been different had the jury been properly instructed. *People v. Pomykala*, 203 Ill. 2d 198, 210 (2003). In particular, error in giving an accountability instruction is harmless where there is sufficient evidence to prove that the defendant actually committed the offense. *People v. Zirko*, 2012 IL App (1st) 092158, ¶ 39; *People v. Scott*, 271 Ill. App. 3d 307, 314 (1994); *People v. Byrd*, 206 Ill. App. 3d 996, 1007 (1990). Here, there was sufficient evidence that respondents actually committed the offense. Thus, any error in instructing the jury regarding accountability was harmless.

¶ 86	B. IPI Criminal 4th No. 5.01B

¶ 87	Respondents next contend that the trial court erred in failing to instruct the jury regarding the definition of *willfully*. During the jury instruction conference, the City requested IPI Criminal 4th No. 5.01B, which defines the terms *knowingly* and *willfully*, but withdrew that instruction. The following day, Hollins requested a nonpattern jury instruction defining *willfully* based on Black's Law Dictionary. The trial court initially stated, "We were talking about willful violation throughout. I think it would be helpful to tell them what's willful." The City, however, argued that willfulness is within the jury's common understanding and, just as reasonable doubt should not be defined, neither should the term *willfully*. Kyles wavered, first stating "we can go with no instruction," then, "Just so the record is clear, I'm for Black's. But can I go without it," then, after the possibility of IPI Criminal 4th No. 5.01B was raised once again, "We don't want that. We'll go with nothing." The court ruled, "We will go with nothing."

¶ 88	Approximately 30 minutes into its deliberations, the jury asked the trial court for a definition of the term *willfully*. The jury note is not included in the record on appeal. The court described the note on record, however, and explained that it had instructed the jury that it had "received all the instructions and evidence the Court has admitted. Please continue to deliberate." Hollins noted his objection: "Just for the record, we had asked that the instruction we tendered regarding willful be tendered to the jury at that time." Kyles did not voice an objection.

¶ 89	The State first argues that respondents forfeited this issue. Kyles included this issue in

his posttrial motion. ("The Court erred by failing to include an instruction on willfulness." "The jurors should have been given guidance on the key element of the crime, particularly when they indicated they were confused and requested guidance.") As did Hollins. ("That the Court erred in not defining the term "willful." "That the Court erred in denying the request from Respondent that the instruction regarding "willful" be tendered to the trier of fact during deliberations.")

¶ 90 But neither respondent requested an IPI Criminal 4th No. 5.01B instruction during the jury instruction conference or when the jury sent its note. Hollins requested a nonpattern jury instruction based on Black's Law Dictionary, but failed to argue that IPI Criminal 4th No. 5.01B inaccurately stated the law. See *People v. Hudson*, 222 Ill. 2d 392, 399-400 (2006) (IPI Criminal should be used, unless it does not accurately state the law (citing Ill. S. Ct. R. 451(a) (eff. July 1, 1997)). As Hollins admits on appeal, the instruction he proffered–"Willful conduct is conduct which is voluntary and intentional, but not necessarily malicious"–improperly raised the City's burden, requiring intentional, rather than willful or knowing conduct. Compare 720 ILCS 5/4-5 (West 2002) (equating *willful* with *knowing*, rather than *intentional*). When the jury asked the trial court to define *willfully*, Hollins renewed his request for a nonpattern jury instruction. Similarly, Kyles did not request an IPI Criminal 4th No. 5.01B instruction. Indeed, when IPI Criminal 4th No. 5.01B was discussed, his attorney stated, "We don't want that. We'll go with nothing." At times, he joined in Hollins' request for a nonpattern jury instruction, but when the jury sent its note, he did not voice an objection. Respondents therefore did not preserve this issue. Nonetheless, they ask us to apply the plain-error doctrine. We must first determine whether error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007); *People v. Herron*, 215 Ill. 2d 167, 179 (2005) (citing Ill. S. Ct. R. 451(c) (eff. July 1, 1997)).

¶ 91 A trial court must instruct a jury that has posed an explicit question or asked for clarification on a point of law. *People v. Childs*, 159 Ill. 2d 217, 228-29 (1994). This is true even where the jury was properly instructed prior to deliberation. *Id.* A trial court may refuse to answer a jury's question if the instructions already given are readily understandable and sufficiently explain the law, further instruction would not be useful or may mislead the jury, the jury's inquiry involves a question of fact, the jury's question is ambiguous, or answering the question would require expressing an opinion that would likely direct the verdict. *People v. Reid*, 136 Ill. 2d 27, 39-40 (1990).

¶ 92 Indirect criminal contempt requires proof beyond a reasonable doubt of (1) the existence of a court order, and (2) the *willful* violation of that order. *People v. Totten*, 118 Ill. 2d 124, 138 (1987). Accordingly, the trial court instructed the jury that "A person commits the offense of indirect criminal contempt when he *willfully* violates a valid court order." The court further instructed the jury regarding the elements of indirect criminal contempt, including "that respondent willfully violated said order." But the court did not instruct the jury pursuant to IPI Criminal 4th No. 5.01B. That instruction provides the following:

"[1] A person [(knows) (acts knowingly with regard to) (acts with knowledge of)] the nature or attendant circumstances of his conduct when he is consciously aware that his conduct is of such nature or that such circumstances exist. Knowledge of a material fact includes awareness of the substantial probability that such fact exists.

[2] A person [(knows) (acts knowingly with regard to) (acts with knowledge of)] the result of his conduct when he is consciously aware that such result is practically certain to be caused by his conduct.

[3] [Conduct performed knowingly or with knowledge is performed willfully.]" IPI Criminal 4th No. 5.01B.

IPI Criminal 4th No. 5.01B is based on section 4-5 of the Illinois Criminal Code, which defines *knowingly* and states, "Conduct performed knowingly or with knowledge is performed wilfully, within the meaning of a statute using the term 'willfully', unless the statute clearly requires another meaning." 720 ILCS 5/4-5 (West 2010).

¶ 93    The parties present two related questions: (1) whether *willfully* has a plain and ordinary meaning within the jurors' common understanding; and (2) whether the trial court was required to instruct the jurors pursuant to IPI Criminal 4th No. 5.01B after they asked for a definition of *willfully*.

¶ 94    The City argues that an instruction was unnecessary, because the meaning of " 'willful' is within the jury's common understanding" and "is not confusing, ambiguous, or subject to different interpretations." See *People v. Sanchez*, 388 Ill. App. 3d 467, 477-78 (2009) (courts need not define words with a commonly understood meaning). Several Illinois decisions have found that *knowing*–an arguably similar term–has a plain and ordinary meaning within the jury's common knowledge, and no instruction need be given absent the jury's request for a definition or expression of confusion. See *People v. Perry*, 2011 IL App (1st) 081228, ¶ 60; *People v. Sanders*, 368 Ill. App. 3d 533, 536-38 (2006); *People v. Sandy*, 188 Ill. App. 3d 833, 841-42 (1989); *People v. Masini*, 65 Ill. App. 3d 1011, 1015 (1978); *People v. Montgomery*, 18 Ill. App. 3d 828, 833-34 (1974).

¶ 95    The same cannot be said of *willful*. The term's legal meaning is notoriously difficult to pin down. See *United States v. Wheeler*, 540 F.3d 683, 689 (7th Cir. 2008) (*willful* may mean intentional or knowing depending on the context); *Bryan v. United States*, 524 U.S. 184, 191 (1998) ("willfully" is "a word of many meanings whose construction is often dependent on the context in which it appears" (internal quotation marks omitted)); *Spies v. United States*, 317 U.S. 492, 497-98 (1943) (*willful* may require voluntary or purposeful conduct in some contexts, but an evil motive in others); *State v. Hanson*, 2012 WI 4, ¶ 21, 338 Wis. 2d 243, 808 N.W.2d 390 ("willful is susceptible of different meanings in different contexts" (internal quotation marks omitted)); *State v. Sinner*, 779 S.W.2d 690, 692-93 (Mo. Ct. App. 1989) ("the term 'willful' has plagued our courts," at times meaning "intentional," at times meaning "intentionally" or "knowingly"); *People v. Clay*, 167 Ill. App. 3d 628, 635 (1988) (equating *willful* with *knowing*, but discussing federal law indicating that *willful* means an "evil motive" or "bad intent or purpose").

¶ 96    The term's meaning in Illinois statutes is no exception. Prior to the Criminal Code of 1961, *willful* was used to describe both intentional and knowing conduct, and sometimes both. Ill. Ann. Stat., ch. 38, ¶ 4-3, Committee Comments, at 199 (Smith-Hurd 1989). Passage of the Criminal Code of 1961 helped matters only slightly, generally equating *willfulness* with *knowledge*, but allowing for other meanings. See 720 ILCS 5/4-5 (West 2010) ("Conduct performed knowingly or with knowledge is performed wilfully, within the

meaning of a statute using the term 'willfully', *unless the statute clearly requires another meaning*." (Emphasis added.)); see also IPI Criminal 4th No. 5.01B, Committee Note ("When willfulness is an issue, Section 4-6 [*sic*] requires the trial court to determine whether the statute using that word 'clearly requires another meaning.' If so, the jury should be instructed accordingly."); 1 John F. Decker & Christopher Kopacz, Illinois Criminal Law § 2.07[b], at 2-81 (5th ed. 2012) ("While clarity was the hallmark of the legislative drafting effort reflected in virtually all of the mens rea definitions contained in article 5/4 of the 1961 code," the definition of *willful* is a "notable exception.").

¶ 97    To the extent that Illinois now equates *willfulness* with *knowledge*, rather than *intent*, our State is out-of-step with several jurisdictions, as well as with the term's common meaning. See, *e.g.*, *State v. Garrard*, 700 S.E.2d 269, 272 (S.C. Ct. App. 2010) (*willful* means "a voluntary and intentional act"); *Fugate v. Florida Election Comm'n*, 924 So.2d 74, 75 (Fla. Dist. Ct. App. 2006) (*per curiam*) (a willful act is "voluntarily and intentionally performed with specific intent and bad purpose to violate or disregard the requirements of the law"); *State v. Parenteau*, 569 A.2d 477, 479 (Vt. 1989) (*willful* "denotes intention" or "by design"); Decker & Kopcz, *supra* § 2.07[b], at 2-81 ("Notwithstanding the fact that a common sense, dictionary definition of 'willful' carries purposive implications, it may reasonably be concluded that these implications are not contemplated in the Illinois usage of the term."); Black's Law Dictionary 1593 (7th ed. 1999) (defining *willful* as "[v]oluntary and intentional, but not necessarily malicious").

¶ 98    The City's argument that the meaning of " 'willful' is within the jury's common understanding" and "is not confusing, ambiguous, or subject to different interpretations" is therefore misplaced. With this in mind, we turn to the second question: whether the trial court was required to instruct the jury pursuant to IPI Criminal 4th No. 5.01B after it asked for a definition of *willfully*. While we have not addressed this precise issue, Illinois courts have addressed a similar question regarding the term *knowingly*.

¶ 99    In *People v. Brouder*, 168 Ill. App. 3d 938, 946 (1988), the jury sent several notes to the trial court indicating that it was confused about the meaning of *knowing resistance* for the purposes of resisting arrest. The trial court twice responded that the jury had heard all of the evidence and received its instructions and should continue to deliberate. *Id.* at 946-47. After the jury continued to express its confusion, defense counsel tendered an instruction defining *knowingly* as "consciously aware that such result is practically certain to be caused by his conduct." (Internal quotation marks omitted.) *Id.* at 947. The trial court never ruled on this issue. *Id.* On appeal, this court held that the trial court had committed reversible error in failing to instruct the jury regarding the definition of *knowingly*. *Id.* at 947-48. Specifically, we noted that, because the jury demonstrated confusion as to a question of law and "specifically requested the trial court's assistance as to the meaning of 'knowing resistance,' " the trial court was required to define the term. (Emphasis omitted.) *Id.* at 948.

¶ 100    After *People v. Brouder*, IPI Criminal 4th No. 5.01B was added to define *knowingly*. IPI Criminal 4th No. 5.01B, Committee Note, at 142; see also *People v. Lowry*, 354 Ill. App. 3d 760, 765 (2004). Since IPI Criminal 4th No. 5.01B's addition in 1989, a general rule has emerged: If a jury asks the court to define a mental state term, or manifests confusion or doubt regarding a term's meaning, the court must instruct them accordingly. See *Lowry*, 354

-19-

Ill. App. 3d at 765-68 (trial court erred in failing to instruct the jury pursuant to IPI Criminal 4th No. 5.01B after jury sent note stating, "knowingly [implies] that it wasn't an accident, or can it be accidental and knowing"); *People v. Comage*, 303 Ill. App. 3d 269 (1999) (trial court erred in failing to instruct the jury pursuant to IPI Criminal 4th No. 5.01B after jury sent note with the word *knowingly* underlined, stating " 'Can we have further explanation on this paragraph?' "); but see *People v. Waldron*, 219 Ill. App. 3d 1017, 1039-41 (1991) (failure to instruct jury was not error, despite note asking court to define *intent*, because jury sent only one note and never expressed that it had reached a "deadlock").

¶ 101    Where, however, a jury neither asks the court to define a mental state term nor manifests confusion or doubt regarding a term's meaning, an instruction is unnecessary. See *People v. Averett*, 381 Ill. App. 3d 1001, 1011-16 (2008) (trial court did not err in failing to define *intent*, where jury's note did not ask for definition of term or show confusion about the term); *People v. Sanders*, 368 Ill. App. 3d 533, 536-38 (2006) (same); *People v. Simester*, 287 Ill. App. 3d 420, 431 (1997) (same regarding *knowledge* and *intent*); *People v. Sandy*, 188 Ill. App. 3d 833, 841-42 (1989) (same regarding *knowingly*); see also *Lowry*, 354 Ill. App. 3d at 768 ("this opinion should not be interpreted as requiring the definition of 'knowingly' to be routinely given in every case"); IPI Criminal 4th No. 5.01B, Committee Note, at 142 ("The Committee takes no position as to whether this definition should be routinely given in the absence of a specific jury request.").

¶ 102    Here, the jury asked the court to define *willfully*, a term that, unlike *knowingly*, does not have a plain and ordinary meaning. As shown above, when a jury expressly asks a trial court to define a mental state term, the court must instruct them accordingly. See *Lowry*, 354 Ill. App. 3d at 765-68; *People v. Comage*, 303 Ill. App. 3d at 273-75; *Brouder*, 168 Ill. App. 3d at 946-48. Thus, the trial court in this case erred in refusing to instruct the jury pursuant to IPI Criminal 4th No. 5.01B.

¶ 103    *People v. Powell*, 159 Ill. App. 3d 1005, 1013-14 (1987), on which the City relies, is factually distinguishable. There, the jury asked the trial court whether intent and knowledge were equivalent. Defense counsel objected to a clarifying instruction, and the court told the jury, " 'so far as the law is concerned, as far as your instructions are concerned, we do not have a separate and distinct definition of intent nor [*sic*] knowingly.' " *Id.* at 1014. The appellate court found that the trial court did not err, because the terms each had a plain and ordinary meaning within a jury's common understanding, and the trial court's response merely allowed the jurors to use their own understanding of the terms. *Id.* at 1013.

¶ 104    The jurors here, unlike those in *Powell*, directly asked the court to define a term, not whether two terms are equivalent. More importantly, the *Powell* court could not have relied on a pattern jury instruction to answer the jury's question because IPI Criminal 4th No. 5.01B did not yet exist. Because the jury in this case directly requested a definition of *willfully*, and because the trial court had the benefit of IPI Criminal 4th No. 5.01B, we hold that the trial court erred in failing to instruct the jury.

¶ 105    We must now decide whether the trial court's error rose to the level of plain error. We may review an unpreserved error where (1) a case is closely balanced, and a clear or obvious error alone threatened to tip the scales of justice against the defendant; or (2) a clear or

obvious error was so serious that it affected the trial's fairness and challenged the integrity of the judicial process. *Piatkowski*, 225 Ill. 2d at 565. Under both plain-error prongs, defendant has the burden of persuasion. *People v. Naylor*, 229 Ill. 2d 584, 593 (2008). Where a defendant fails to establish plain error, the result is procedural default. *Id.*

¶ 106    Respondents are not entitled to a new trial under the first plain-error prong. The question is whether the evidence was so closely balanced that the jury may have reached its verdict based on the error, not the proper evidence, and wrongly convicted an innocent person. *Herron*, 215 Ill. 2d at 179. Put another way, was the evidence that respondents *willfully* occupied E2 closely balanced? We hold that it was not.

¶ 107    There was ample evidence that respondents willfully violated a clear building court order. Seven witnesses testified that E2 was occupied post-July 19, 2002, and Kyles himself testified that he and Hollins continued to operate E2 between July 19, 2002, and February 16, 2003. Even if we accepted respondents' claim that they believed the order barred occupancy of only the mezzanine VIP area, the same seven witnesses testified that E2's mezzanine was regularly occupied post-July 19, 2002. Respondents' claim that they were unaware that the VIP area was being used taxes the imagination. The evidence, in short, was not closely balanced, such that the failure to instruct the jury pursuant to IPI Criminal 4th No. 5.01B could have tipped the scales against respondents.

¶ 108    Nor was the error here so serious that it affected the trial's fairness and challenged the integrity of the judicial process. *Piatkowski*, 225 Ill. 2d at 565. In recent years, our supreme court has clarified that plain error under the second prong is severely limited. See *People v. Thompson*, 238 Ill. 2d 598, 613-15 (2010) (equating the second prong of plain error with the federal structural error standard); *People v. Glasper*, 234 Ill. 2d 173, 199-200 (2009) (same). Jury instructions regarding the elements of the offense are essential to a fair trial, and the failure to instruct a jury in these areas constitutes grave error. *People v. Reddick*, 123 Ill. 2d 184, 198-99 (1988). But the trial court here instructed the jury regarding the elements of indirect criminal contempt. The court erred only in refusing to define *willfully*. This error was not so serious that it affected the trial's fairness and challenged the integrity of the judicial process. A defendant's right to have a term defined–even a term describing the requisite mental state–does not rise to the same level of importance as instructing the jury on the elements of the offense. This is especially true where instructing a jury pursuant to IPI Criminal 4th No. 5.01B (equating *willfully* and *knowingly*) would have presented a lower threshold for the City than the common meaning of the term (often equating *willfully* with *purposefully*, *intentionally*, or with an evil motive).

¶ 109    Alternatively, Hollins claims that his attorney was ineffective in failing to tender IPI Criminal 4th No. 5.01B. The right to counsel guaranteed by the United States and Illinois Constitutions includes the right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To prevail on an ineffective assistance of counsel claim, "[a] defendant must show that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *People v. Manning*, 241 Ill. 2d 319, 326 (2011) (citing *Strickland*, 466 U.S. at 688). Under the first *Strickland* prong, a defendant must show that his trial attorney's

performance was deficient. *People v. Enis*, 194 Ill. 2d 361, 376 (2000). Under the second, a defendant must show that counsel's deficient performance undermined confidence in the trial's outcome. *Id.*

¶ 110    In *Lowry*, we held that defense counsel provided deficient representation where, faced with a jury note requesting a definition of *knowingly*, he agreed that no instruction was necessary. *Lowry*, 354 Ill. App. 3d at 767. We noted that counsel there showed that his inaction was not strategic, but, rather, due to confusion regarding the jury's question. *Id.* We further held that counsel's deficient performance prejudiced defendant, because his mental state was a critical issue at trial. *Id.* at 768.

¶ 111    This case is distinguishable from *Lowry*. Unlike *knowing*, *willful* is a slippery term with several meanings. As the jury instruction conference illustrates, Hollins' attorney was aware of IPI Criminal 4th 5.01B, but chose not to tender it. Defense counsel's choice of jury instructions is normally a tactical decision within his or her discretion. *People v. Mims*, 403 Ill. App. 3d 884, 890 (2010); *People v. Bobo*, 375 Ill. App. 3d 966, 977 (2007). The instruction Hollins tendered based on Black's Law Dictionary was considerably more favorable to the defense than IPI Criminal 4th No. 5.01B. IPI Criminal 4th No. 5.01B equates *willful* and *knowing*, and therefore sets a low threshold for the City. The instruction Hollins sought–"Willful conduct is conduct which is voluntary and intentional, but not necessarily malicious"–would have set a higher hurdle for the State to clear, as it equated *willful* and *intentional*.

¶ 112    Unlike in *Lowry*, counsel's refusal to tender IPI Criminal 4th No. 5.01B constituted reasonable trial strategy. Because IPI Criminal 4th No. 5.01B's description of *willfully* is more favorable to the prosecution than the common meaning of the term–or, for that matter, the definition given in several other jurisdictions–it would be reasonable for defense counsel to forgo instructing the jury pursuant to that instruction. Thus, defense counsel's failure to tender IPI Criminal 4th No. 5.01B fell within the realm of reasonable trial strategy. See *People v. Mims*, 403 Ill. App. 3d 884, 890 (2010) (to prove counsel's ineffectiveness, defendant must overcome the presumption that counsel's conduct was strategic).

¶ 113    Even if counsel's performance had been deficient, Hollins did not suffer prejudice as a result. See *Manning*, 241 Ill. 2d at 326 (under the second *Strickland* prong, defendant must show that, but for counsel's errors, the result of the proceeding would have been different). As explained above, instructing the jury pursuant to IPI Criminal 4th No. 5.01B would not have affected the outcome at trial, because there was ample evidence that, regardless of which meaning of the term the jury applied, respondents willfully violated the building court's order. Accordingly, we reject Hollins' ineffectiveness claim.

¶ 114                                III. Sentencing

¶ 115    Prior to sentencing, respondents moved to preclude the State from introducing evidence of the E2 tragedy in aggravation. They argued that the tragedy was irrelevant because contempt involves an offense to the dignity of the court. Kyles noted that the court had barred evidence of the tragedy at trial and "[t]o change the rules and let that evidence come in at sentencing is inappropriate." He added that this court had already ruled that the building code

violation and the tragic deaths were not connected. See *People v. Kyles*, No. 1-07-0284, slip op. at 8, 11-14 (July 24, 2008) (unpublished order under Supreme Court Rule 23). The City contended that respondents "kept the place open because of greed" and should not be able to "escape the consequences of what they did." The court agreed with the City and denied respondents' motions. During sentencing, the City presented no witnesses in aggravation, but focused on the E2 tragedy in argument. Respondents presented 10 witnesses in mitigation and rarely mentioned the tragedy. The trial court sentenced respondents to two years' imprisonment.

¶ 116    Respondents argue on appeal that the trial court improperly considered the tragedy in aggravation. The City admits that "the deaths and injuries at the club were not directly attributable to the building's defects," but argues that the tragedy was a proper consideration because, but for respondents' violation of the order, E2 would have been closed and the tragedy would not have occurred.

¶ 117    At the outset, we address Kyles' contention that this court resolved this issue in *People v. Kyles*, No. 1-07-0284, slip op. at 8, 11-14 (July 24, 2008) (unpublished order under Supreme Court Rule 23), and consideration of the E2 tragedy was therefore barred by the doctrine of collateral estoppel. Collateral estoppel bars relitigation of an issue where (1) the court rendered a final judgment in a prior case; (2) the opposing party in the instant case was a party in the prior case or in privity with a party in the prior case; and (3) the issue decided in the prior case is identical with the one presented in the instant case. *People v. Tenner*, 206 Ill. 2d 381, 396 (2002). The issues presented in *People v. Kyles* and this case are not identical. There, the question was whether the trial court in Kyles' involuntary manslaughter case erroneously barred evidence during the guilt-innocence phase that Kyles knew that the building court had ordered E2 to be closed. *Kyles*, slip op. at 8, 11-14. Here, the question is whether the trial court erred in considering the E2 tragedy in aggravation during sentencing. Although there is overlap between these cases, the issues are not identical, and the doctrine of collateral estoppel does not apply.

¶ 118    Turning to the merits, we believe that neither party accurately frames the issue. Kyles argues that "the deaths at the nightclub were unrelated to the building code violation." Hollins likewise contends, "A tragedy happened on February 17, 2003, but it has nothing to do with the court order or the basis for the underlying finding of contempt of court." We disagree. The building court ordered respondents to vacate the second floor of 2347 South Michigan Avenue. Had respondents complied, E2 would have been closed on the night of the tragedy. Thus, as the City argues, "but for respondents' ignoring the orders, the deaths and injuries would not have occurred."

¶ 119    Put another way, respondents' violation of the building court's order was a cause in fact of the clubgoers' deaths and injuries. See *People v. Johnson*, 392 Ill. App. 3d 127, 131 (2009) (" 'Cause in fact exists where there is a reasonable certainty that a defendant's acts caused the injury or damage.' " (quoting *Rice v. White*, 374 Ill. App. 3d 870, 888 (2007)); see also 1 Wayne R. LaFave, Substantive Criminal Law § 6.4(b), at 467 (2d ed. 2003) (conduct is the cause in fact of a result if "the result would not have happened in the absence of the conduct; or, putting it another way, that 'but for' the antecedent conduct the result would not have occurred."); Decker & Kopacz, *supra* § 6.11[e], at 6-43 (" 'Cause in fact' exists where

-23-

there is a legal certainty that a defendant's conduct produced a result.").

¶ 120     Nor is the City's description of the issue wholly accurate. The City argues that "Respondents' contempt of the orders most certainly caused the deaths and injuries–had respondents not disobeyed them, no one would have been on the building's second floor, and no one would have died or suffered injury." The City ignores that the type of harm–21 people crushed to death in a panic after security guards sprayed pepper spray in an attempt to subdue a fight–was not reasonably foreseeable given respondents' contumacious conduct. Respondents' building code violations could have resulted in many different types of harm had the trusses failed and the mezzanine collapsed. But the death and injury caused in this case were not related to these structural flaws. The tragedy here was extraordinary and unforeseeable.

¶ 121     In other words, respondents' violation of the building court's order was *not* the legal, or proximate, cause[3] of the clubgoers' deaths and injuries. *People v. Hudson*, 222 Ill. 2d 392, 401 (2006) ("Legal cause 'is essentially a question of foreseeability'; the relevant inquiry is 'whether the injury is of a type that a reasonable person would see as a likely result of his or her conduct.' " (quoting *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252, 258 (1999)); see also 1 Wayne R. LaFave, Substantive Criminal Law § 6.4, at 464 (2d ed. 2003) ("even when cause in fact is established, it must be determined that any variation between the result intended (with intent crimes) or hazarded (with reckless or negligent crimes) and the result actually achieved is not so extraordinary that it would be unfair to hold the defendant responsible for the actual result"); Decker & Kopacz, *supra* § 6.11[e], at 6-43 (" 'Legal cause' is established if a result was foreseeable to a reasonable person as a likely result, although the exact nature of the result or the exact way in which it occurs need not be foreseeable.").

¶ 122     Another panel of this court reached a similar conclusion in Kyles' involuntary manslaughter case:

"The mezzanine and VIP boxes on the second floor did not fail under the weight of patrons in the nightclub. Rather, the stampede and tragic deaths resulted from the completely unrelated event of security guards using pepper spray to break up a fight on the dance floor.

*** [T]he element of *proximate cause is *** lacking* since the State's hypothetical truss failure did not cause the patrons to flee for the stairway on February 17, 2003." (Emphasis added.) *People v. Kyles*, No. 1-07-0284, slip op. at 8, 11-14 (July 24, 2008) (unpublished order under Supreme Court Rule 23).

Although, as discussed above, collateral estoppel does not apply, we again conclude that respondents' violation of the building court's order was a cause in fact, but not the legal or proximate cause, of the clubgoers' deaths and injuries. Death caused by panic, caused by release of pepper spray, caused by security guards' attempts to break up a fight, is not the type of harm that a reasonable person would see as a likely result of violating a court order

_____

[3]Some decisions and treatises use proximate cause to denote the combination of cause in fact and legal causation. Others use it synonymously with legal causation. We use it in the latter sense.

regarding a building's structural flaws.

¶ 123　Having cleared the brush, the question here becomes apparent: during sentencing, may a trial court consider in aggravation deaths that were factually, but not proximately, caused by respondents' indirect criminal contempt?

¶ 124　We begin with a review of the law regarding sentencing and contempt. Criminal contempt is a crime in the normal sense and is punishable by fine or imprisonment. *Bloom v. Illinois*, 391 U.S. 194, 201 (1968). The power of courts to punish for contempt is inherent and can be neither created nor limited by statute. *People v. Geiger*, 2012 IL 113181, ¶ 24. Because it is not subject to legislation, contempt has no sentencing classification or range. *Id.* Accordingly, "[w]hen imposing a sentence for contempt, courts should keep in mind that '[t]he contempt power is an extraordinary one that should be used sparingly and with the utmost sensitivity.' " *Id.* ¶ 25 (quoting *In re G.B.*, 88 Ill. 2d 36, 52-53 (1981) (Simon, J., dissenting)). When exercising this power, courts must avoid arbitrary or oppressive conclusions. *People v. Simac*, 161 Ill. 2d 297, 306 (1994). Criminal contempt, unlike civil contempt, is punitive in nature. *People v. Warren*, 173 Ill. 2d 348, 368 (1996). Sentences for criminal contempt are intended to vindicate the dignity and authority of the court. *Simac*, 161 Ill. 2d at 305-06; *People v. Colclasure*, 48 Ill. App. 3d 988, 991 (1977); *People v. Kennedy*, 43 Ill. App. 2d 299, 302 (1963).

¶ 125　Because the offense of criminal contempt is not bound by sentencing ranges, appellate courts have a " 'special responsibility for determining that the [contempt] power is not abused.' " *Geiger*, 2012 IL 113181, ¶ 27 (quoting *Green v. United States*, 356 U.S. 165, 188 (1958)). " 'Punishment of criminal contempt should reflect the "least possible power adequate to the end proposed." [Citation.]' " *Id.* (quoting *United States v. Bukowski*, 435 F.2d 1094, 1110 (7th Cir. 1970)). In sentencing a criminal contemnor, a trial court may consider (1) the extent of the willful and deliberate defiance of the court's order; (2) the seriousness of the consequences of the contumacious behavior; (3) the public interest in terminating the defendant's defiance; and (4) the importance of deterring future acts. *Id.* ¶ 28 (citing *United States v. United Mine Workers of America*, 330 U.S. 258, 302-03 (1947)). Sentences imposed for criminal contempt are reviewed for an abuse of discretion. *Geiger*, 2012 IL 113181, ¶ 27; *In re B.J.*, 268 Ill. App. 3d 449, 452 (1994).

¶ 126　Illinois criminal law is filled with proximate cause decisions. Most fall into three areas: (1) murder cases where medical negligence may have been an intervening cause (see, *e.g.*, *People v. Domagala*, 2013 IL 113688; *People v. Mars*, 2012 IL App (2d) 110695; *People v. Caldwell*, 295 Ill. App. 3d 172 (1998); *People v. Gulliford*, 86 Ill. App. 3d 237 (1980)); (2) driving under the influence cases where death or injury results (see, *e.g.*, *People v. Martin*, 2011 IL 109102; *People v. Lavallier*, 187 Ill. 2d 464 (1999); *People v. Johnson*, 392 Ill. App. 3d 127 (2009); *People v. Merrick*, 2012 IL App (3d) 100551)); or (3) felony-murder cases (see, *e.g.*, *People v. Dekens*, 182 Ill. 2d 247 (1998); *People v. Nash*, 2012 IL App (1st) 093233; *People v. Lowery*, 178 Ill. 2d 462 (1997); *People v. Martinez*, 342 Ill. App. 3d 849 (2003)).

¶ 127　The parties have not presented, nor have we discovered, an Illinois contempt case that concerns proximate cause. The general principles regarding proximate cause, however, are

clear. "Causal relation is the universal factor common to all legal liability." *People v. Lowery*, 178 Ill. 2d 462, 466 (1997). Proximate cause is "essentially a question of foreseeability." (Internal quotation marks omitted.) *Hudson*, 222 Ill. 2d at 401. The question is whether harm is a type that a *reasonable person* would see as a likely result of his or her conduct. *Id.*

¶ 128     Proximate cause is generally a prerequisite to criminal liability. See, *e.g.*, *People v. Dekens*, 182 Ill. 2d 247, 249 (1998) (liability only attaches in felony-murder cases if defendant's conduct proximately caused death); *People v. Cook*, 2011 IL App (4th) 090875, ¶ 17 (legal liability is generally limited to cases where the prosecution can demonstrate proximate cause). Accordingly, Illinois courts have generally held that, where there is insufficient proof that a criminal defendant proximately caused an injury, that harm may not be considered in aggravation during sentencing.

¶ 129     In *Maldonado*, the prosecution presented evidence that the defendant had previously been convicted of robbery and that the victim in that case had never fully recovered from a beating sustained during the offense. *People v. Maldonado*, 80 Ill. App. 3d 1046, 1048 (1980). The appellate court found that "the brutal manner in which the robbery was carried out would have some relevance to ascertaining the defendant's character and rehabilitative potential. However, no causal connection has ever been established between the defendant's act of beating [the victim] and the alleged facts that he never recovered, was subsequently unable to perform his duties, and was accordingly discharged." *Id.* at 1051. The court held that this evidence was improper and remanded for a new sentencing hearing. *Id.*

¶ 130     In *People v. Lurks*, 241 Ill. App. 3d 819, 820 (1993), the defendant sexually assaulted a pregnant woman, who had been planning to marry her live-in boyfriend. During sentencing, the trial court noted, " 'we heard that she didn't marry the young man and she doesn't live with his family anymore and she doesn't have a baby anymore. Her life significantly changed.' " *Id.* at 823. This court found that "there is no evidence *** connecting the rape to the victim's decision to move out of [her boyfriend's] house and her failure to marry ***. The trial court could not properly consider those facts in aggravation." *Id.* at 827.

¶ 131     Finally, in *People v. Gant*, 18 Ill. App. 3d 61, 64 (1974), the defendant and an accomplice robbed a woman of her purse. One of the men dragged the woman by her hair; the other placed his arm around her neck. *Id.* She died two days later, but neither of the men was charged in her death, and no evidence was presented showing that the defendant caused her death. *Id.* Yet the trial court stated, " 'this woman did die and although apparently there was not sufficient evidence to charge them with the murder or involuntary manslaughter whatever the case may be, certainly this event was a contributing factor to her death, traumatic shocks, and they have that to carry with them and I am taking that into consideration *** in imposing sentence in this case.' " *Id.* at 65. This court found that the trial court should not have considered her death in aggravation, as that was neither charged nor proved:

"The record in the present case reflects that the trial judge did allow his determination of the sentence to be affected by the death of the complaining witness for which he believed the defendants to be in some way responsible. But there was absolutely no evidence adduced at trial which would support such a belief. The defendant was 'clothed

-26-

in a presumption of innocence' regarding the death of the complaining witness, and it was therefore prejudicial to him when the trial judge imposed a sentence based at least in part on his belief that the defendant was somehow responsible for her death [citation]." *Id.* at 66-67.

The *Gant* court therefore reduced the defendant's sentence. *Id.*

¶ 132    In *Gant, Lurks*, and *Maldonado*, the prosecution failed to show that the defendants proximately caused the harm presented. Here, we *know* respondents' violation of the building court's order did not proximately cause the E2 tragedy. Even the City admits that "the deaths and injuries at the club were not directly attributable to the building's defects." It would therefore be inappropriate to hold respondents liable for the deaths and injuries that occurred on February 17, 2003.

¶ 133    To the extent that a chain of causation existed, the security guard's release of pepper spray that night was a supervening cause that broke that chain. An intervening cause is " '[a]n event that comes between the initial event in a sequence and the end result, thereby altering the natural course of events that might have connected a wrongful act to an injury.' " *People v. Herman*, 347 Ill. App. 3d 525, 530-31 (2004) (quoting Black's Law Dictionary 212 (7th ed. 1999)). An intervening cause completely unrelated to the defendant's acts–that is, a supervening cause–will relieve the defendant of criminal liability. *Domagala*, 2013 IL 113688, ¶ 39. The release of pepper spray to break up a fight was completely unrelated to respondents' violation of the building court's order. It was a supervening act that relieved them of legal responsibility.

¶ 134    We note that the State's failure to convict respondents of involuntary manslaughter for the E2 tragedy, by itself, would not bar consideration of the E2 deaths and injuries in aggravation. " '[E]vidence of criminal conduct can be considered at sentencing even if the defendant previously had been acquitted of that conduct.' " *People v. Deleon*, 227 Ill. 2d 322, 340 (2008) (quoting *People v. Jackson*, 149 Ill. 2d 540, 549 (1992)). Acquittal does not demonstrate a defendant's innocence. *Jackson*, 149 Ill. 2d at 549. It means only that the prosecution was unable to prove the defendant guilty beyond a reasonable doubt. *Id.* Acquittal therefore does not bar presentation of those facts at sentencing, where the burden of proof is lower. *Id.*; see also *People v. Rose*, 384 Ill. App. 3d 937, 944 (2008) (the exclusionary rule does not apply to sentencing, where evidentiary standards are less rigid).

¶ 135    The concern, rather, is that the evidence presented be relevant and reliable. *People v. Williams*, 149 Ill. 2d 467, 490 (1992). The deaths and injuries at E2 on February 17, 2003, are not relevant to establishing the seriousness of respondents' offense or determining their rehabilitative potential. See *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005) (criminal penalties must be determined " 'both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship' " (quoting Ill. Const. 1970, art. I, § 11)). As we have established, there is no reliable evidence that respondents proximately caused the E2 tragedy. Indeed, the parties agree–and another panel of this court has previously held–that respondents' violation of the building court order did not proximately cause the E2 tragedy. We now hold that the deaths and injuries in this case were factually, but not proximately, caused by respondents' indirect criminal contempt and were not a proper aggravating factor.

¶ 136　　We must next determine if the trial court considered this improper factor in aggravation and, if so, what weight the court attributed to it. Absent an affirmative showing of error, we must presume that the sentencing court knew and properly applied the law. *People v. Smith*, 176 Ill. 2d 217, 260 (1997). Where a sentencing court considers an improper factor, however, we must reverse, unless we can determine from the record that the weight placed on the improper factor was "so insignificant that it did not lead to a greater sentence." *People v. Heider*, 231 Ill. 2d 1, 21 (2008). Where a reviewing court is unable to determine what weight the trial court gave to an improper sentencing factor, the cause must be remanded for resentencing. *People v. Bourke*, 96 Ill. 2d 327, 332 (1983).

¶ 137　　Here, the trial court improperly considered the E2 tragedy in aggravation. First, the trial court denied respondents' motions to bar evidence of the E2 tragedy during sentencing. Then, the City focused on the tragedy during its argument in aggravation:

"Judge, in the City's position this is a case that cries out for justice.

　　We are here six years later, 21 people dead. And the reason those 21 people are dead is because these two men willfully violated four court orders that had been put in place to protect the public.

　　To this day neither man has come to grips with the consequences of his action. Neither of the defendants has expressed one ounce of remorse. Despite a jury finding in this case that was based on overwhelming evidence neither one of these defendants if asked today will say that they did–they will say that they did absolutely nothing."

The City later stated, "The truth of the matter is [Hollins] like Mr. Kyles has expressed no remorse with respect *** to the 21 people being dead." The City continued, "The bottom line is that because of their willful and wanton violations of these court orders we have 21 people dead. As such, Judge, we ask you and we believe that justice cries out for it, both of these men should receive substantial periods of incarceration."

¶ 138　　The City's rebuttal argument also emphasized the E2 tragedy: "I respect all the [mitigation witnesses] who stood up today and, you know, I respect everything they said. I just want to remind your Honor that there are 21 people who couldn't stand up today." The City further argued, "but for what they did, those 21 people would be alive today if they had stepped up *** and if they had closed the place which they chose not to do." The City ended its rebuttal by revisiting this issue:

"Judge, once again, I am going to say to you when you hear all of this, they still don't believe that they did anything wrong. They need to be told and they need to be sent a message about those 21 people who would still be alive here today. And we ask that you do that."

Consonant with its denial of the motion *in limine*, the court made no further statement rejecting the relevance of the City's arguments assessing blame for the 21 deaths on respondents' violation of the court orders. Respondents presented 10 mitigation witnesses. They rarely mentioned the tragedy in closing argument. While in its brief pronouncement, the trial court did not expressly mention the February 17, 2003, or the E2 tragedy, the judge stated, "I did seriously consider probation, however, it is the conclusion of this court that probation would deprecate under all the facts and circumstances of this case this serious

-28-

nature of this matter." The trial court's denial of respondents' motion, the State's focus on the E2 tragedy in argument, and the trial court's reference to the "serious nature" of the offense all indicate that the court relied on the tragedy in sentencing respondents.

¶ 139    The length of respondents' sentences also evidences the court's reliance on the E2 tragedy. The length of a criminal defendant's sentence may be a factor in determining whether he received a greater sentence based on an improper aggravating factor. See, *e.g.*, *People v. Johnson*, 347 Ill. App. 3d 570 (2004) (remanding for a new sentencing hearing where court considered improper factor and defendant's sentence was only 10 years less than the minimum nonextended-term sentence for residential burglary). Contempt poses a unique problem, as it is not subject to a sentencing range. *Geiger*, 2012 IL 113181, ¶ 24. Even without such guidelines, however, respondents' two-year sentences appear lengthy. Disregarding a court order is undoubtedly a serious matter. That is especially true in this case, where respondents' conduct threatened serious harm–had the mezzanine collapsed, it could have killed or injured hundreds of people. See *People v. Saldivar*, 113 Ill. 2d 256, 265-66 (1986) (sentencing courts may consider in aggravation that a defendant's conduct caused or threatened serious harm). Yet no physical harm proximately resulted from respondents' contumacious conduct. Accordingly, respondents' sentences exceed what is necessary to vindicate the dignity and authority of the court. See *Simac*, 161 Ill. 2d at 305-06 (criminal contempt sentences are intended to vindicate the dignity and authority of the court).

¶ 140    Respondents urge us to compare their sentences to those in *Welch v. City of Evanston*, 181 Ill. App. 3d 49 (1989), and *City of Rockford v. Suski*, 307 Ill. App. 3d 233 (1999). The defendant in *Welch* was sentenced to pay fines and fees for indirect criminal contempt after he violated a court order barring occupancy of his building's basement unit. *Welch*, 181 Ill. App. 3d at 51, 53-54. The defendant in *Suski* was sentenced to 30 days' imprisonment for indirect criminal contempt after he violated a court order vacating his multi-unit rental property. *Suski*, 307 Ill. App. 3d at 237-38, 241.

¶ 141    Although the sentences in *Welch* and *Suski* stand in stark contrast to the two-year sentences imposed in this case, we must decline respondents' invitation to compare these cases. Our supreme court rejected comparative sentencing in *People v. Fern*, 189 Ill. 2d 48, 55 (1999). The *Fern* court found that comparative sentencing did not fit with Illinois' emphasis on individualized sentencing or trial court's sentencing discretion: "The fact that a lesser sentence was imposed in another case has no bearing on whether the sentence in the case at hand is excessive *on the facts of that case*." (Emphasis in original.) *Id.* at 56. The sentences imposed in *Welch* and *Suski* are therefore irrelevant. For similar reasons, we reject the City's comparison of this case to *People v. Levinson*, 75 Ill. App. 3d 429 (1979), as well as Hollins' comparison of his two-year sentence with the two-to-five-year sentencing range for involuntary manslaughter, of which he was not convicted. See 720 ILCS 5/9-1(d)(1) (West 2002) (involuntary manslaughter is a Class 3 felony).

¶ 142    Regardless, there is sufficient evidence that the trial court improperly relied on the E2 tragedy in sentencing respondents. The record shows that (1) the court denied respondents' motions to bar the improper evidence; (2) the State focused on this evidence in closing argument; (3) the court noted the "serious nature of this matter"; and (4) respondents' two-year sentences were lengthy, even considering the serious danger that the building's

structural flaws posed. We therefore hold that the trial court improperly relied on the E2 tragedy in aggravation and vacate respondents' two-year sentences. Because the extent of the trial court's reliance on the tragedy is unclear, we also remand this cause for resentencing. See *Bourke*, 96 Ill. 2d at 332 (where reviewing court is unable to determine what weight the trial court gave to an improper aggravating factor, the cause must be remanded for resentencing).

¶ 143    In doing so, we reiterate that contempt is unique among criminal offenses, and sentences for criminal contempt are intended to vindicate the dignity and authority of the court. *Simac*, 161 Ill. 2d at 305-06; *Colclasure*, 48 Ill. App. 3d at 991; *Kennedy*, 43 Ill. App. 2d at 302. As a reviewing court, we have a " 'special responsibility for determining that the [contempt] power is not abused.' " *Geiger*, 2012 IL 113181, ¶ 27 (quoting *Green v. United States*, 356 U.S. 165, 188 (1958)). " 'Punishment of criminal contempt should reflect the "least possible power adequate to the end proposed." [Citation.]' " *Id.* (quoting *United States v. Bukowski*, 435 F.2d 1094, 1110 (7th Cir. 1970)).

¶ 144    Our holding should not be taken to mean that respondents are free of criminal liability. "The requirement of causation in criminal law, more often than not, serves not to free defendants from all liability but rather to limit their punishment consistent with accepted theories of punishment." LaFave, *supra* § 6.4(c), at 472. As our supreme court has ruled, "respondents were proved guilty beyond a reasonable doubt of indirect criminal contempt because a rational jury could have found that they were fully aware of what the building court's orders prohibited and willfully disobeyed the orders." *Le Mirage, Inc.*, 2013 IL 113482, ¶ 76. Respondents, however, should not be punished for acts they did not proximately cause.

¶ 145                                  CONCLUSION

¶ 146    For the foregoing reasons, we affirm respondents' convictions, vacate their sentences, and remand for resentencing.

¶ 147    Convictions affirmed; sentences vacated; remanded for resentencing.